**SOUTH IOWA METHODIST HOMES, INC.,**
Appellant,

v.

**BOARD OF REVIEW OF the CITY OF
DES MOINES, Appellee.**

No. 53612.

Supreme Court of Iowa.

Jan. 13, 1970.

Rehearing Denied March 9, 1970.

Dickinson, Throckmorton, Parker, Mannheimer & Raife, by John R. Mackaman, Des Moines, for appellant.

Herrick, Langdon, Belin & Harris, by Jeffrey E. Lamson, Des Moines, for appellee.

SNELL, Justice.

This is a church-related retirement home property tax case. It is a de novo appeal from the decision of the trial court, sitting in equity, which in effect affirmed the decision of the defendant Board of Review in placing plaintiff's property, known as Wesley Acres, on the tax rolls as of January 1, 1967.

The issues before the trial court were:

1. Is the plaintiff a charitable, religious and benevolent institution within the meaning of section 427.1(9), Code of Iowa 1966, and is its real property, known as "Wesley Acres", and the personal property used by it being used for its appropriate objects, and

2. Was plaintiff deprived of equal protection of the laws by the action of the defendant Board of Review.

The trial court filed findings, ruling and order which had the effect of sustaining the action of the defendant Board.

The issues on appeal are the same as those before the trial court.

Except for a difference of opinion as to allocation of assets to different funds there is little dispute as to the facts.

Plaintiff was originally organized in 1947, under the name of "Wesley Acres", pursuant to the provisions of chapter 504 of the Code as a corporation not for pecuniary profit. It was existing under the provisions of that chapter on January 1, 1967. Its property had been exempt from about 1948 until the defendant's clerk, the city assessor, denied its claim for exemption in 1967.

In May of 1967, plaintiff voluntarily elected to adopt the Iowa Nonprofit Corporation Act, chapter 504A of the Code. Restated Articles of Incorporation with concurrent amendments were adopted and filed.

Plaintiff was organized at the instigation of the South Iowa Annual Conference of the Methodist Church, then known as the Iowa Des Moines Annual Conference of the Methodist Church. That body originally purchased the property which is the subject matter of this action. It has always operated under the discipline of the Methodist Church. The Methodist Church in 1946 had purchased the former Chamberlain residence on Grand Avenue in Des Moines, which was then conveyed to plaintiff in 1948 after plaintiff's organization. The trustees (now directors) of plaintiff have always included the resident Bishop of the Methodist Church and other church officials, and laymen elected by the Conference of the Methodist Church.

The Methodist Church has committed its credit to the repayment of mortgage used to finance an addition to the plaintiff's property.

The Methodist Church, both its Conference and individual churches, has always supported the plaintiff financially. The property was originally purchased with church funds at a cost of $52,500. In addition to plaintiff's receiving a part of the South Iowa Annual Conference dollar, which in the year ending April 30, 1968, amounted to $5,500, the plaintiff has received quite substantial contributions for its building fund from the South Iowa Annual Conference. In the year ended April 30, 1967, it received $57,313 from that source, and in the year ended April 30, 1968, it received $69,227.98 from that source. These funds come from individuals among the 300,000 Methodists. The Annual Conference votes on how the money will be divided, and it allocated to the plaintiff a total of $500,000 over a ten year period for capital expansion to be used by plaintiff to add a convalescent wing.

The general manager of plaintiff is an ordained minister in the Methodist Church. He was assigned to that position by the Bishop of the Methodist Church. The general manager of plaintiff considers his assignment as general manager as a part of his ministry. The Methodist Church likewise considers his work part of the ministry.

There is a chapel at Wesley Acres. Regular chapel services are held each Wednesday afternoon and are often conducted by guest preachers. The sacraments of the church are administered regularly, there are Sunday School classes, and there are regular mealtime devotions.

Plaintiff is subject to the discipline of the Methodist Church, a book of Church Government, and would be denied the use of the name Methodist if it violated that discipline. Being a Methodist is not a condition of residency at Wesley Acres. More than 59% of the members have not been Methodists.

The Wesley Acres property consists of the original Tudor type mansion, not now used for residence, a two-story addition constructed in 1954, containing 16 residence rooms and the 1960 addition which is a four-story building with a full basement, containing 85 rooms for residents, and infirmary space for 20 people, a kitchen, dining room, chapel, lounge and basement recreational area. Plaintiff had intended to use the capital fund allocation from the Methodist Church, with other funds, to add a convalescent wing to accommodate 50 to 60 people. FHA had indicated mortgage money would be available to help with that project. That project was shelved when the tax question arose.

Plaintiff provides the services of a house physician. Plaintiff also provides drugs and medicines for its residents which are likewise paid for by it.

No application for membership has ever been turned down because of financial reasons. It has always been plaintiff's policy to admit not less than 10% of its residents without a room gift. Through December of 1966, 17% of its residents had paid no room gift, and an additional 11% had paid only a partial room gift. Plaintiff has never denied continued residency to an old age recipient.

Those who cannot pay the current monthly charges are subsidized through the Good Samaritan Fund which consist of deceased members' prepaid care and contributions.

Plaintiff enjoys the services of a Guild with an active membership of about 150 women. The Guild assists the residents in finding satisfaction in group living and in community activities. It has helped the members with various community projects, such as sacks for Good Will Industries, envelopes for March of Dimes and Easter Seals, bandages for a hospital in Rhodesia, Except for voluntary, nonpaid help, plaintiff's operating loss would be very large.

The Iowa Home for Sightless formerly operated a home for blind ladies. It was "a fire trap." In 1960 the Home was merged with plaintiff. The blind residents were moved to remodeled quarters in plaintiff's home. Plaintiff assumed the assets and liabilities including liability for caring for the residents.

Prior to 1960 the Home for the Aged operated a facility for the elderly. It was merged with plaintiff and the residents moved to Wesley Acres. None has paid any of his own funds to plaintiff. The assets of the corporation were transferred to plaintiff.

According to the plaintiff's books, there is a deficit as a result of the Home for the Aged amalgamation. The computation of that deficit does not consider possibility of realizing funds from the sale of Trust property, or the possibility of the Home for the Aged being the beneficiary under ambulatory wills.

By using different assumptions and bookkeeping allocations defendant estimates an ultimate gain.

There was an excess of expenses over income for the years ended April 30, 1968, in the amount of $8,941.22, and a similar excess of expense over income in the year ended April 30, 1967, in the amount of $19,441.00. This is computed by including as income all payments, including room gifts, from members. The deficit is made up by contributions. Again by using different allocation of receipts defendant challenges the assumption of an operating loss. No officers or committees are paid for any service, and no excess of income over expenses is distributed to any person at all.

Plaintiff's income is exempt from Federal income tax under section 501(c) (3) of the Internal Revenue Code and consequently is exempt from the State income tax. It is listed as an organization to which contributions are deductible under section 170(c) of the Internal Revenue Code. It is recognized as an organization to which bequests are exempt from the Iowa In-

heritance Tax by the State Department of Revenue.

The assessed valuation of the property for the year 1967 was $348,330 which, at the 1967 millage rate would produce taxes of $43,525.58. The assessed valuation of the personal property was $19,500, which would produce at the 1967 millage rate of taxes $2,434.62, or total taxes of $45,962.20. Assuming 127 residents, that would amount to $361.91 per year per resident, or $30.16 per month per resident.

Applicants for membership at Wesley Acres are expected to fill out a preliminary application form. No independent effort is made to verify financial information given; it is needed to determine whether or not the person will be able to himself take care of his financial needs. Applications are accepted even though the financial statement is null. They are accepted by superintendents. They are acted upon by the Management Committee, and eventually the Executive Committee of the Board of Trustees. Criteria used in determining acceptability include personality traits, character, needs of the applicant, possible conditions of senility, and chronic illness. The only physical qualification for membership is reasonably good health and being ambulatory.

A regular infirmary is maintained for residents who develop a need for such care. The patient census is about 27. However, Wesley Acres is a retirement home as distinguished from a nursing home.

Once admitted, people are taken care of as long as they live with the exception of mental breakdowns which seldom occur. No person has even been dismissed because of mental deterioration, but several have gone to mental institutions and then returned. Board of Health regulations do not permit plaintiff to keep persons who become violent. Wesley Acres is licensed as a custodial home in the residential section and as a nursing home in the infirmary section by the State Board of Health.

The State Board of Health sets a requirement for staffing, fire protection and the like, and Wesley Acres is inspected by the State Board of Social Welfare and Federal Housing Administration.

In addition to Wesley Acres, plaintiff maintains homes in Atlantic and Washington, Iowa. The Washington home was opened in 1959 and has room for 24 residents. It was having financial difficulty and asked the Methodist Church to help it out. The Atlantic home, Heritage House, was opened in 1963, and will take care of approximately 100 people. The community of Atlantic raised $117,000 initially for that home.

People of advanced years have health related problems which can be better managed at a place like Wesley Acres where there is an infirmary, registered nurses, balanced meals, and outsiders who are interested in them.

Over the county people in retirement homes, regardless of their financial condition, live from three to five years longer than they do outside.

As noted, supra, plaintiff's property (Wesley Acres) was originally purchased with church funds. The present buildings as of April 30, 1968 were carried on the plaintiff's accountant's records at $1,282,891.26. The buildings were financed by the South Iowa Methodist Conference, individual churches, personal contributions, room gifts and a long term mortgage insured by the Federal Housing Administration. The Methodist Church was required to commit itself to repayment of the mortgage. As of April 30, 1968 there was unpaid on this debt a current portion of $17,935.89 and a long term portion of $651,474.67. For tax purposes the assessor and board of review assessed the property at $348,330.00 with a tax liability of $45,962.20.

Applicants for residence in Wesley Acres make written application stating personal history and a summary of fixed and liquid assets including a statement of ability and

willingness to make a room gift. Persons admitted when financially able make a "room gift" of $7,500. All "room gifts" are shown as income to the building fund. Seventy-two percent of the residents made this "room gift." Eleven percent paid part and seventeen percent paid nothing. In some instances the "room gifts" were paid for the applicant by others. Room gifts do not buy any part of or interest in the building. No property right is acquired in the room so endowed. It is not a condominium in any sense.

The ordinary monthly charge per resident is $160. Of the 127 residents 96 are paying the full amount or relatives and friends are paying for them.

The applications for membership show that 10 had "ample" or "adequate" assets, 3 owned farm land totaling 920 acres and among the others there were assets totaling $3,524,185. The assessor's records showed taxable moneys and credits of $1,684,128. It is obvious from the records that there are persons with financial substance living at Wesley Acres but the records also show that 62 do not have sufficient income to pay $160 per month. In some cases their resources are being consumed and depleted but they are still maintained even after their resources are exhausted. Residents do not know who pays and who does not. There is no distinction between affluence and poverty.

The financial records show that except for gifts and contributions Wesley Acres could not operate.

The trial court found:

"The facilities of the plaintiff locally known as Wesley Acres make excellent provision for the physical, mental and emotional needs of those elderly persons who reside there. The community is fortunate to have such an institution available. The residents by their room gifts and monthly payments are in effect pooling their resources and obtaining for themselves those accommodations and services that the aged person requires."

The trial court then concluded "that the plaintiff's real estate here under consideration is not used solely for a charitable purpose."

We disagree that the room gifts and monthly payments provide the services rendered. They make up only a part of the cost.

I. The pertinent parts of section 427.1, Code of 1966, read as follows:

"Exemptions. The following classes of property shall not be taxed: * * *

"(9) All grounds and buildings used * * * by * * * charitable, benevolent, * * * and religious institutions and societies solely for their appropriate objects * * *."

The case turns upon the meaning of the words in this statute.

Our latest consideration of the statute appears in South Iowa Methodist Homes, Inc. v. Board of Review of Cass County, 257 Iowa 1302, 136 N.W.2d 488.

That case involved the taxation, during construction, of a facility by plaintiff and for the same purpose as Wesley Acres. By stipulation the question of "appropriate objects" was removed and the opinion started with the assumption that the building when completed and occupied would be within the exemption.

■ Plaintiff here relies strongly on its charter provisions to lend weight to its claim for tax exemption. Plaintiff's Articles of Incorporation clearly show that the purposes for which plaintiff exists are within the statute. This is not enough. As will be shown in Division II, infra, the use of the property and not the purposes of the institution applying for exemption controls the availability of exemption under the statute.

The trial court stressed room gifts and monthly payments in denying exemption. Room gifts and monthly payments by those who are able to pay are not the sole criteria by which we may ascertain whether the use or uses made by plaintiff of Wesley Acres are for its "appropriate" objects as a charitable institution. We must, therefore, determine first what objects are charitable and second, whether the actual uses made by plaintiff are consistent therewith.

It should be kept in mind that the statute does not limit exemption to facilities used solely by or for the financially destitute.

As many of the basic problems now before us are thoroughly discussed in both the majority and dissenting opinions in South Iowa Methodist Homes v. Board of Review, supra, we will refer thereto but omit the citations therein.

We are fully aware of the problems facing taxing authorities incident to exempt property. We quote from the dissenting opinion:

"The tax burden, federal, state and local, grows heavier and heavier. The amount of property of the national and state governments, and of various institutions exempted under our statutes, likewise increases by leaps and bounds. So as taxes increase, the amount of property available to pay them diminishes. Thus 'charity' is often illusory. * * *" (loc. cit. 1314 of 257 Iowa, loc. cit. 495 of 136 N.W.2d)

However, if our tax and exemption statutes are to be revised the problem is for the legislature and not the courts.

█ As noted in the majority and dissenting opinions taxation is the rule and exemption the exception. Exemption statutes are to be strictly construed. (loc. cit. 1304 and 1309, 136 N.W.2d 488)

These rules must be applied in harmony with the legislative mandate to construe the provisions and proceedings under the Code "liberally" and "with a view to promote its objects and assist the parties in ob-

taining justice." Section 4.2, Code of Iowa. (loc. cit. 1305 of 257 Iowa, 136 N.W.2d 488)

█ Institutional exemptions are viewed with more favor than exemptions to private persons. [loc. cit. 1305 of 257 Iowa, 136 N.W.2d 488)

National Bank of Burlington v. Huneke, 250 Iowa 1030, 98 N.W.2d 7, involved a charitable trust. The testator bequeathed his property to a trustee "for the express and sole purpose of acquiring, constructing, maintaining, and operating a charitable, * * * hospital * * * and to operate the aforesaid hospital on a strictly charitable, scientific and educational basis, so that none who need the use of said facilities may be denied admittance, and I do hereby specifically direct that no substantial part of the activities of such trustee shall be carrying on propaganda or otherwise attempting to influence legislation, and I further hereby specifically direct that the aforesaid hospital shall be operated on a strictly nonprofit basis and that in the managment thereof only such charges may be made from patients admitted as may be necessary to meet current operating and maintenance expenses, and that no profit shall be charged any persons seeking admittance thereto." (loc. cit. 1033 of 250 Iowa, loc. cit. 9–10 if 98 N.W.2d)

The hospital was to be operated on a nonprofit basis. Charges were limited to the amount necessary to meet current expenses. Patients were not limited to those unable to pay.

In a significant particular the case before us is similar, i. e. admission is not limited to those who can pay either in the way of a "room gift" or monthly charge.

In Huneke, supra, exemption was upheld. While the case involved a moneys and credits tax the reasoning is appropriate here.

First Methodist Episcopal Church of Ft. Madison v. Donnell, 110 Iowa 5, 81 N.W. 171, 46 L.R.A. 858, involved a subscription

**532**

to build a church. It is helpful here only for the definition of charity. We quote:

" \* \* \* the sole purpose of the plaintiff's statutory existence as a corporate body was to do good. If so, contributions for its support must be classed as charity. 'Charity,' says Judge Cooley in Allen v. Duffy, [43 Mich.1, 38 Am.Rep. 159] 4 N.W. 427, 'is active goodness. It is doing good to our fellow men. It is fostering those institutions that are established to relieve pain, to prevent suffering, and to do good to mankind in general or any class or portion of mankind.'" (loc. cit. 5 and 6, loc. cit. 171 of 81 N.W.)

See also Morrow v. Smith, 145 Iowa 514, 124 N.W. 316, 26 L.R.A.,N.S., 696 for discussion of charity.

Chapman v. Newell, 146 Iowa 415, 125 N.W. 324 quotes several definitions of "charitable gift" and gifts considered as such. Among them are: " 'Charity' is defined as something done out of good will, benevolence, and a desire to add to the happiness or the improvement of one's fellow beings", and "almost anything that tends to promote the well-doing or well-being of social man." (loc. cit. 420, loc. cit. 327 of 125 N.W.)

■ Various definitions and examples of charity and charitable gifts are considered in Heald v. Johnson, 204 Iowa 1067, 216 N.W. 772. Detailed analysis of the multitude of authorities on this subject would unduly extend this opinion and serve no useful purpose. An appropriate example appears in Andrews v. Y.M.C.A., 226 Iowa 374, 284 N.W. 186. We quote:

"Appellant has introduced evidence and has cited authorities in support of its position that it comes within the class of charitable institutions. It is our judgment that it does. Benevolence and charity do not always consist wholly of almsgiving, or the relief of the wants of the needy, or helpless. It includes also the gratuitous or partly gratuitous improvement of spiritual, mental, social and physi-

cal conditions of young people, by the maintenance of courses of study, lectures, religious services, libraries, entertainments, gymnasiums, recreation grounds, and other kindred activities, by various institutions. [Citations] The appellant has been, and is doing a highly commendable and admirable service." (loc. cit. 383 and 384, loc. cit. 191 of 284 N.W.)

To paraphrase, we think appellant in the case before us is rendering a commendable and admirable service that is vitally needed. We think its objects are charitable.

■ II. Nonprofit status of a corporation does not establish a right to tax exemption. The articles of incorporation may be considered but are not controlling. In Readlyn Hospital v. Hoth, 223 Iowa 341, 344, 272 N.W. 90, 91, this rule is stated:

"The objects and purposes of the corporation as expressed in its articles of incorporation may be considered in determining this question, but the recital thereof in its articles is not controlling in determining the question of exemption. This question must be determined from the use made of the property rather than the declaration made in its articles of incorporation."

See also Theta Xi Building Association v. Board of Review, 217 Iowa 1181, 1183, 251 N.W. 76.

III. We do not agree with the trial court that the residents obtain accommodations by pooling their resources. There is no pooling of assets. There is no claim that the total of all room gifts did or could finance the facility. The evidence indicates that the per room cost was far in excess of any room gift. The residents regardless of their finances, including those with none, receive the same care, accommodations and attention.

■ It should be kept in mind that it is the use of the property by the institution, not by its members, that determines whether the use is objectively appropriate.

A church does not lose tax exemption because some of its members are wealthy or because it is built through subscriptions and contributions. A hospital does not lose tax exemption because it charges patients for care. A school does not lose exemption by charging tuition. Income producing property owned by a nonprofit corporation may be subject to property tax but that is not the kind of property involved here. Plaintiff should not lose its tax exempt status because many of the residents can and do make room gifts and pay a monthly charge.

IV. We are not unaware of the multitude and diversity of pronouncements among jurisdictions. There is little discernible harmony. To use an overworked statement "each case is decided according to its own merits." In each case there is some distinguishing feature or statute. Those homes where admission is limited to the physically and financially independent are held taxable. There is no such limitation here.

Defendant cites and quotes from Methodist Old Peoples Home v. Korzen, 39 Ill. 2d 149, 233 N.E.2d 537, at 542:

"While charging fees would not necessarily remove plaintiff from the category of a charitable institution * * *, *the fact that it allocates living space from the standpoint of desirability of location and size on the basis of the amounts of the Founder's Fee* (cf. 'occupancy fee' in the case at bar) and monthly charges paid by a resident seems to us lacking in the warmth and spontaneity indicative of charitable impulse. Rather, it seems more related to the bargaining of the commercial market place." (Emphasis added)

In the case before us the size of a room gift in no way controls the accommodations furnished.

V. We conclude that plaintiff is an institution within the meaning of section 427.1(9), Code of Iowa, and that its property is being used for its appropriate objects.

VI. Plaintiff argues that the action of defendant Board of Review deprives plaintiff of equal protection of the law. Because of our conclusions stated, supra, we need not consider this claim.

VII. The case is reversed and remanded to the trial court with directions to enter a decree sustaining plaintiff's claim to tax exemption.

Reversed and remanded.

All Justices concur.