**R.K. RICHARDS, Appellant,**

v.

**IOWA DEPARTMENT OF REVENUE, Appellee.**

**No. 86–1121.**

Supreme Court of Iowa.

Oct. 21, 1987.

R.K. Richards, Ames, pro se.

Thomas J. Miller, Atty. Gen., Harry M. Griger, Sp. Asst. Atty. Gen., and James D. Miller, Asst. Atty. Gen., for appellee.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, CARTER, and LAVORATO, JJ.

LAVORATO, Justice.

In this judicial review proceeding we must decide whether the district court erred in upholding the decision of the director of revenue to allow a property tax exemption to Northcrest, Inc. Upon our review under the substantial evidence standard of Iowa Code section 17A.19(8)(f) (1981),[1] we conclude the court was correct and affirm.

Northcrest is the operator of a nonprofit community for elderly people in Ames.[2] Since its inception in 1962 Northcrest has received exemptions under both the federal and state tax laws because of its charitable status. *See* 26 U.S.C. § 501(c)(3); Iowa Code § 427.1(9).[3]

In 1982 R.K. Richards, the pro se appellant here, challenged Northcrest's state exemption for the 1981 tax year under Iowa Code section 427.1(26),[4] which allows any taxpayer to request revocation by the director of an improperly granted exemption.

Richards argued before the Department of Revenue[5] that there were three basic reasons that Northcrest was not a charitable institution and therefore did not de-serve a tax exemption. First, Northcrest does not provide its residents with a wide enough scope of care. Second, Northcrest's expenses are supported largely by payments from residents rather than by charitable contributions. Third, of the contributions Northcrest does receive, a large proportion is from residents rather than outside donors.

After the director decided to uphold the exemption granted by the Ames Board of Review, Richards filed a petition for judicial review. *See* Iowa Code § 427.1(26). We said on interlocutory appeal that this petition was served in a manner permitted by statute, reversing the district court's ruling on the department's special appearance. *Richards v. Iowa Dep't of Revenue*, 362 N.W.2d 486 (Iowa 1985). In a decision on the merits, the district court then upheld the director's decision by finding it to be supported by substantial evidence. *See* Iowa Code § 17A.19(8)(f).

In this court the department argues for the first time that Richards does not have standing to bring a judicial review action, and Richards asks, in addition to his arguments regarding the exemption, that we tax costs to the department regardless of our decision on the merits.

The director's findings of fact, which were adopted in full by the district court, reveal that Northcrest was organized in 1962 as a nonprofit corporation under chapter 504 of the 1958 Iowa Code. North-

---

1. Except where otherwise noted, all references in this opinion are to the 1981 Iowa Code.

2. In this opinion we will refer to the corporate entity and the nonprofit community collectively as "Northcrest."

3. Iowa Code section 427.1 provides in pertinent part:
 The following classes of property shall not be taxed:
 ....
 9. ... All grounds and buildings used ... by ... charitable ... institutions and societies solely for their appropriate objects, not exceeding three hundred twenty acres in extent and not leased or otherwise used or under construction with a view to pecuniary profit.

4. Iowa Code section 427.1(26) provides in pertinent part:

26. *Revoking exemption.* Any taxpayer ... may make application to the director of revenue for revocation for any exemption, based upon alleged violations of the provisions of this chapter.... [A]ny order made by the director of revenue revoking or modifying such exemption shall be subject to judicial review in accordance with the terms of the Iowa administrative procedure Act. Notwithstanding the terms of said Act, petitions for judicial review may be filed in the district court having jurisdiction in the county in which such property is located, and must be filed within thirty days after any order revoking such exemption is made by the director of revenue.

5. The "department," as we call it in this opinion, is now known as the Department of Revenue and Finance. *See* Iowa Code § 421.2 (1987).

crest's articles of incorporation state its "purpose and objects . . . shall be exclusively for religious, charitable, literary and scientific purposes in the care of the physical, social, psychological, religious, and intellectual needs of . . . elderly persons." The articles go on to say that to achieve these ends, Northcrest will build and operate residence facilities for such persons and that Northcrest's income shall be used exclusively for the stated purposes. Northcrest's operations are governed by a board of directors who serve without compensation.

The Director of Revenue noted that "[g]ifts of service, money and goods played a large role in the founding of Northcrest." These contributions took several forms. Approximately $50,000 in cash donations was received during Northcrest's early days both from individual donors and from civic clubs, public utilities, the city of Ames, and various local merchants. In addition, by the end of 1966 about $50,000 more in charges for architectural services, materials, supplies, travel, and other expenses was either waived or paid by donors. After the Northcrest residence facilities were opened, local doctors initially excused portions of medical fees charged to residents.

By 1981 Northcrest was a complex of interconnected buildings containing eighty-six residential apartments of three sizes, common areas for the use of the residents, guest rooms which could be rented to visitors at a nominal charge, and a twenty-eight-bed health care center. In addition, fifty-two garages were available at a small fee for residents' automobiles. Northcrest sits on twenty-two and one-third acres "located in a desirable section of Ames," as the director described it. The assessed value of this real property in 1981 was $2,475,600; thus, Northcrest's property tax liability for that year without the exemption would be approximately $50,000.

Northcrest had 125 residents in 1981, and their incomes varied from under $7000 to over $20,000, with assets ranging from under $20,000 to over $200,000. This financial information is provided to Northcrest by each applicant for residency, who must also disclose how the individual plans to pay Northcrest's fees and what potential sources of alternative financial support exist should the applicant's own resources become exhausted. Northcrest, however, does not have any policy of refusing applicants who are unable to pay full fees.

Each applicant must also undergo a physical examination so a physician can certify that the applicant can live without any special assistance. Northcrest does not accept applicants in poor health because it is not a nursing home; its health care center is intended only for residents who become ill after entering Northcrest.

In addition to the health and financial information each applicant must disclose, Northcrest also requires that applicants be over sixty-two years old, unless an accompanying spouse is of that age, and requests a fifty dollar application fee, which may be waived for those unable to pay. While Northcrest has refused applicants because of poor health, it has granted admission to seven people who could not pay the full fees.

A number of fees are required of those persons accepted as residents. The largest sum is the "resident endowment," a one-time payment of between $23,600 and $52,500, depending on the size of the apartment the resident desires. The resident also pays a monthly charge based on apartment size, ranging from $260 to $526. The final mandatory fee is a monthly payment of $43.50 for Northcrest's health plan.

In addition to the mandatory fees, a resident may choose to rent a garage or storage unit, to take meals in a dining hall for a fee, and to make the suggested contribution of $4200 to Northcrest's "development fund" upon admission. The director indicated in his findings of fact that it was apparently this last sum which was waived for the seven applicants unable to pay the full fees.

Many entering residents, however, have contributed more than the suggested amount, and the Internal Revenue Service considers the development fund contribution to be charitable and thus deductible.

The director noted that the IRS classification of these contributions and the excess amounts given by some entering residents indicated that the development fund contributions were, in fact, "made of the individual's own free will," despite the "inherently coercive" nature of Northcrest's request at the time of admission.

Although the residents' regular fees pay for most of Northcrest's operating expenses, the director found that "donations play a role in its operations as well." The total value of money and gifts received in 1980 was $14,400, and in 1981, $12,000, exclusive of development fund contributions.

While many of the gifts came from residents, these donations, according to the director, were not coerced from the residents or made in return for any special services. For example, residents contributed money for the purchase of medical equipment to be used for all residents' benefit.

In addition, Northcrest established a "permanent endowment fund" in late 1981, the investment of which produces income to be used for charitable disbursals to residents. This fund has received about $45,000 in donations since its creation.

Finally, besides gifts of goods and money, several individuals and groups have donated services. The donors include the residents themselves; girl scouts; various church groups; and the board of directors, who serve without compensation. According to Northcrest's treasurer, donated services have been worth perhaps "half a million dollars or more" since Northcrest's inception.

The director found that "the evidence is suitable to indicate ... the donations did result in a reduction in the payments which each and every resident was required to make," which is in keeping with Northcrest's stated policy of granting charitable assistance to the residents.

These donations and the residents' fees pay for a wide variety of services. Perhaps the most substantial of the services offered by Northcrest is the guarantee of lifetime care. Residents receive complete care, including housing and payment of all medical expenses not covered by insurance, for the duration of their lives, even if they are totally unable to pay Northcrest's fees.

In addition, Northcrest provides many things to aid the residents in enjoying life to its fullest extent: a library; exercise equipment; dietary advice; garden plots; laundry and meeting rooms; facilities for artistic pursuits; transportation to the university campus in Ames; minor repair of personal appliances; organization of residents' bills; reminders of when to take medication; a security system; and "buddy" arrangements between residents, who check on each other to make sure no one has fallen ill.

Summarizing one expert's testimony, the director noted that "Northcrest creates an environment for its residents which enables them to maintain their self-sufficiency and independence for as long as possible and promotes their feelings of security and safety, matters of special concern to the elderly." Former Iowa Governor Robert Blue, an attorney and public figure who has taken an active role in issues related to aging, testified that homes like Northcrest save the taxpayers money by providing an alternative to government-sponsored facilities and are more cost-efficient than either government or commercial homes.

In his decision for the department upholding the exemption granted by the Ames Board of Review, the director concluded that

[c]onsidering the common law's definition of "charity" ..., it is reasonably clear that what Northcrest does for its residents fits that definition of charity.... "Good" is done for the residents, their pain is relieved and their suffering prevented. Northcrest residents are relieved from "disease, suffering or constraint" and the charity which Northcrest extends to a few of its wealthier residents is also extended to persons, who if they are not utterly destitute, could certainly be considered poor. The courts have emphasized "the gratuitous or partly gratuitous care of elderly per-

sons is a charitable purpose." ... Northcrest provides partly gratuitous care for elderly persons who are not utterly destitute but whose resources are limited to the point that care of them can truly be considered charity.

(Citations omitted.) The district court, when it reached the merits after our interlocutory decision, emphasized this last sentence when it affirmed the decision of the director.

In addition, the district court taxed costs against Richards. It reasoned that in taxpayer actions at the agency level lay persons should not have to bear costs because of the inevitable chilling effect costs would have against such actions. But when the taxpayer persists in pursuing a losing claim on judicial review, the court said, the usual rule of awarding costs to the prevailing party and against the losing party must be followed.

Richards' appeal in this court raises three issues. First, Richards maintains that the care given to residents is too limited to be considered charitable. Because applicants must prove themselves physically self-sufficient before admission and because only limited medical care is provided at Northcrest, Richards contends, in effect, that Northcrest is no different from a commercial, less care-oriented residential complex.

Second, he argues that the amount of the fees charged to the residents indicates that it is the residents themselves, rather than charitable contributors, who actually support the operating expenses of Northcrest. Richards claims that although there is no policy against admitting persons unable to pay the fees, the financial disclosure required of applicants and the fact that very few residents have actually been unable to pay indicate that Northcrest does not serve elderly people in need. Moreover, Richards points out that the residents themselves pay for a health insurance plan and that Northcrest would not be able to afford its obligatory lifetime care of residents who might become destitute.

Third, Richards contends that of the contributions Northcrest does receive, a large proportion comes from the residents, which

also indicates that they are not receiving gratuitous services but are in reality paying for them. Further, he argues whether or not they are legitimate charitable contributions, the donations cover such a small percentage of the Northcrest operating budget that it cannot be said that charity defrays, in any significant way, the cost to the residents.

We will address these arguments after disposing of the department's contention as to Richards' standing to bring this appeal.

I. *Standing.*

The department contends that Richards does not have standing to bring this judicial review action. Although this issue was not raised below, the department argues it may be raised initially in this court because it is a part of subject matter jurisdiction.

 It is correct that issues of subject matter jurisdiction may be raised at any time. *See, e.g., Uchtorff v. Dahlin,* 363 N.W.2d 264, 267 (Iowa 1985). The cases, however, indicate that standing is not among these issues and must be raised from the outset in order to preserve error. *See Iowa–Illinois Gas & Elec. Co. v. Iowa State Commerce Comm'n,* 347 N.W.2d 423, 427 (Iowa 1984) (in judicial review action appellant is obliged to raise standing in district court to preserve the issue, even though issue was already raised before the agency); *Schwarzkopf v. Sac County Bd. of Supervisors,* 341 N.W.2d 1, 2–3 (Iowa 1983) (while argument on standing may have had merit if raised earlier, proponent waived objection by failure to raise it in timely manner); *Cole v. City of Osceola,* 179 N.W.2d 524, 527–28 (Iowa 1970) (standing argument is waived if not raised in timely manner). Hence, because the department did not raise the issue of standing in earlier proceedings, we will not address the merits of its argument on this issue. *See Hoekstra v. Farm Bureau Mut. Ins. Co.,* 382 N.W.2d 100, 107 (Iowa 1986).

II. *Whether the Director's Decision that Northcrest is a Charitable and Exempt Institution is Supported by Substantial Evidence.*

Using the arguments described above, Richards maintains, in effect, that the di-

rector's decision that Northcrest is a charitable, and thus exempt, institution is unsupported by substantial evidence. Because of this deficiency, Richards argues, the district court erred in affirming that decision.

A. *Scope of review.* As specified in the statute under which Richards brings this judicial review action, our review is governed by the Iowa Administrative Procedure Act (IAPA), chapter 17A of the Iowa Code. *See* Iowa Code § 427.1(26). "When, under the IAPA, this court reviews a district court decision on the validity of an agency action, we ask only whether the district court has correctly applied the law." *Norland v. Iowa Dep't of Job Serv.*, 412 N.W.2d 904, 908 (Iowa 1987) (citing *Jackson County Pub. Hosp. v. PERB*, 280 N.W.2d 426, 429 (Iowa 1979)). If, after applying the standards of Iowa Code section 17A.19(8) to the agency action, our conclusion is the same as that of the district court, we must affirm. *Norland*, 412 N.W.2d at 908; *see also Teleconnect Co. v. Iowa State Commerce Comm'n*, 404 N.W.2d 158, 161–62 (Iowa 1987); *Jackson County Pub. Hosp.*, 280 N.W.2d at 429–30.

▆ The relevant issue here, whether Northcrest is a charitable institution, is a fact question. *Cf. Community Drama Ass'n v. Iowa State Tax Comm'n*, 252 Iowa 854, 859, 109 N.W.2d 23, 26 (1961) (whether party's activities are exempt as educational is a fact question under statute also listing charitable activities). In general, we give agency fact findings deference because of the presumably greater expertise an agency has over matters within its purview. *Norland*, 412 N.W.2d at 908; *Churchill Truck Lines, Inc. v. Transportation Regulation Bd.*, 274 N.W.2d 295, 299 (Iowa 1979); *Davenport Water Co. v. Iowa State Commerce Comm'n*, 190 N.W.2d 583, 591–92 (Iowa 1971). We have spoken before of the particular expertise the legislature intended the department of revenue to exercise over matters affecting tax exemptions:

By vesting power to revoke exemptions with the department of revenue, the legislature provided for consistency and predictability in the exemption system where the focus is ... on determining the legal effect of a property's declared use....

... [T]he legislative scheme expressed in section 427.1(26) recognizes that the expertise to pass on issues of property tax exemption rests with the department of revenue [rather than boards of review].

*South Iowa Methodist Homes, Inc. v. Board of Review*, 393 N.W.2d 804, 807 (Iowa 1986). We think the courts in judicial review actions, like the boards of review at an earlier stage in the exemption system, must defer to the department's expertise regarding revocation of exemptions. Unless the department is wrong as a matter of law, we should broadly and liberally apply its findings in order to uphold rather than defeat its decision. *Norland*, 412 N.W.2d at 909; *Ward v. Iowa Dep't of Transp.*, 304 N.W.2d 236, 237 (Iowa 1981).

B. *The substantial evidence standard.* Richards argues, in effect, that the department's decision upholding Northcrest's charitable and exempt status was unsupported by substantial evidence and was thus wrong as a matter of law. *See* Iowa Code § 17A.19(8)(f) ("The court shall reverse ... if substantial rights of the petitioner have been prejudiced because the agency action is ... unsupported by substantial evidence in the [agency] record ... when that record is viewed as a whole."); *see also City of Davenport v. PERB*, 264 N.W.2d 307, 311 (Iowa 1978). Our analysis on this issue, like our scope of review in general, is deferential. The department's factual determinations are "binding on the courts when they are supported by substantial evidence. 'Evidence is not insubstantial merely because it would have supported contrary inferences. It is substantial when a reasonable mind could accept it as adequate to reach the same findings.'" *Norland*, 412 N.W.2d at 913 (quoting *New Homestead v. Iowa Dep't of Job Serv.*, 322 N.W.2d 269, 270 (Iowa 1982)) (citation omitted); *see also Iowa Malleable Iron Co. v. Iowa Employment Sec. Comm'n*, 195

N.W.2d 714, 717 (Iowa 1972). Hence, we must determine whether the objective "reasonable mind" rather than this particular court could apply the relevant law to the evidence and reach the same findings as the department.

C. *Substantiality of the evidence supporting Northcrest's charitable status.* 1. *The legal meaning of "charity."* Whether substantial evidence exists to support a finding that Northcrest is a charitable institution depends on what is meant by "charity." While the common use of the word implies meanings as narrow as alms-giving to the poor, *see The Random House Dictionary* 154 (1980), or as broad as "any act of kindness or benevolence," 71 Am.Jur.2d *State and Local Taxation* § 363, at 670 (1973), the current legal definition favors the latter, wider scope:

> The general trend of authority in cases determining the charitable character of institutions for tax exemption veers away from the old concept that charity is confined to the "free" care of the indigent, and toward the idea of charity as comprehending all humanitarian activities....

Annotation, *Receipt of Pay From Beneficiaries as Affecting Tax Exemption of Charitable Institutions,* 37 A.L.R.3rd 1191, 1197 (1971) (hereinafter cited as *Receipt of Pay* ); *see also* 71 Am.Jur.2d *State and Local Taxation* § 363, at 670 (In tax exemption statutes, "the term ['charity'] may be ... defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, ... by relieving their bodies from ... suffering or constraint ... or otherwise lessening the burdens of government.").

Iowa law has long embraced the broad view of charity. For example, in *Andrews v. YMCA,* 226 Iowa 374, 383, 284 N.W. 186, 191 (1939), the court said "charity [does] not always consist wholly of alms-giving, or the relief of the wants of the needy, or helpless. It includes also the gratuitous or partly gratuitous improvement of spiritual, mental, social and physical conditions of young people...." This view has since been reaffirmed. *See South Iowa Method-*

*ist Homes, Inc. v. Board of Review,* 173 N.W.2d 526, 532 (Iowa 1970) (quoting *Andrews* definition in context of retirement home exemptions); *Evangelical Lutheran Good Samaritan Soc'y v. Board of Review,* 267 N.W.2d 413, 414 (Iowa App.1978) (*South Iowa* "stands for the proposition that the gratuitous or partly gratuitous care of elderly persons is a charitable purpose.").

Iowa law also recognizes the rationale for charitable exemptions associated with the broad definitions noted above: "[Exemption statutes] are 'a legislative recognition of the benefits received by society as a whole from properties devoted to appropriate objects of exempt institutions and the consequent lessening of burden on the government.'" *Dow City Senior Citizens Hous., Inc. v. Board of Review,* 230 N.W. 2d 497, 499 (Iowa 1975) (citation omitted).

2. *Factors showing charitable status.* a. *Federal exemption and stated purpose.* A number of factors under Iowa law are relevant to whether property has been devoted to appropriately charitable objects. Two which need no explanation are whether the institution received a federal tax exemption based on charitable status, *see South Iowa,* 173 N.W.2d at 528, and the purposes of the institution as stated in its articles of incorporation, *id.* at 532 (articles of incorporation are relevant but not controlling). Northcrest satisfies these factors: it has received a federal tax exemption for two decades, and its articles of incorporation clearly state its property and income are to be used exclusively for the needs of elderly persons.

b. *Actual use of the property.* While the stated purpose of the institution has significance, a more important factor is the property's actual use. *Evangelical Lutheran Good Samaritan Soc'y v. Board of Review,* 200 N.W.2d 509, 511 (Iowa 1972); *South Iowa,* 173 N.W.2d at 530. The relevant use in the present case is the type and degree of care Northcrest offers to elderly persons. For an institution to be charitable it should provide care in addition to housing. *See Dow City,* 230 N.W.2d at 499. Further, the health requirements imposed

on applicants for residency are relevant because they demonstrate to what degree the institution is willing to care for its residents. *See* 71 Am.Jur.2d *State and Local Taxation* § 387, at 697–98; *cf.* Annotation, *Homes for the Aged as Exempt From Property Taxation,* 37 A.L.R.3d 565, 575–76 (1971).

Richards argues Northcrest's care is inadequately charitable because applicants must prove themselves physically fit before they are admitted to Northcrest and because Northcrest provides only limited medical care once they are admitted. We disagree that these facts show a lack of substantial evidence of Northcrest's charitable status.

■ By itself, Northcrest's fitness requirement for applicants might militate against a finding of charitable status because it would show, as Richards argues, Northcrest is unwilling to care for residents with health problems. The existence of Northcrest's health care center, however, demonstrates Northcrest's readiness to meet such needs when they arise in already-admitted residents. This willingness to care for residents is further emphasized by Northcrest's contractual obligation to provide complete health care, including hospitalization outside of Northcrest, for residents who cannot pay for such care themselves. That Northcrest is not a nursing home does not negate its charitable status; Northcrest's organizers simply chose another way to engage in the improvement of elderly persons' physical conditions. This improvement is clearly a charitable use under our law. *See, e.g., South Iowa,* 173 N.W.2d at 532. Northcrest can easily be distinguished from the institution in *Dow City,* 230 N.W.2d at 499–500, in which we upheld the denial of an exemption to a solely residential senior citizens' complex.

c. *Financing of Northcrest's operations.* Richards also contends the nature of Northcrest's financing indicates its lack of charitable status. He makes two arguments in this respect. First, he maintains that fees charged to residents, rather than charitable contributions and subsequent disbursals, support most of Northcrest's operating costs. He points out that Northcrest assures itself of this support from residents by closely scrutinizing applicants' financial resources and that few residents have ever been unable to pay Northcrest's fees.

Second, he argues the contributions Northcrest does receive contribute inadequately to its budget and come largely from the residents themselves, showing that the residents are also paying through their contributions for the services they receive. Richards adds that Northcrest's financial condition would preclude it from honoring the lifetime care obligation if several residents did become indigent.

To begin our discussion of these arguments, we first take note of a legal factor regarding charitable status which is relevant under our statute and the cases: the nonprofit nature of an institution. *See Evangelical Lutheran,* 200 N.W.2d at 511–12 (exemption not proper for institution operated for profit); Iowa Code § 427.1(9) (exemption not allowed to institution operated "with a view to pecuniary profit"). It is undisputed Northcrest has satisfied this factor by operating as a nonprofit institution.

■ Charging the residents fees does not indicate an institution is intended to make a profit, even when that income exceeds the institution's expenses. *See Receipt of Pay,* 37 A.L.R.3d at 1197 (income in excess of operating costs does not destroy charitable, exempt status when excess is devoted to charitable purposes rather than individuals' profit); *cf. Milwaukee Protestant Home for the Aged v. City of Milwaukee,* 41 Wis.2d 284, 296, 164 N.W.2d 289, 294 (1969) ("A benevolent association is not required to use only red ink in keeping its books and ledgers."). Hence, even though Northcrest's income for 1981, $672,581, was slightly in excess of its expenses, $664,982, Northcrest can still be considered eligible for exemption since no evidence indicates the excess was used for anything but charitable purposes.

Richards, however, contends the support Northcrest derives from residents, even if

not profitable in a legal sense, contravenes its claim of charitable status because the residents are paying for services rather than having them provided by charitable disbursals. He points to the financial disclosure required of applicants, the one-time mandatory "resident endowment" payment, and the fixed monthly payments as evidence that Northcrest is more commercial than charitable.

■ We agree a truly charitable institution will make concessions on fees to residents unable to pay them. *See Iowa Methodist Hosp. v. Board of Review*, 252 N.W. 2d 390, 392 (Iowa 1977); *Dow City*, 230 N.W.2d at 499. But "the statute does not limit exemption to facilities used solely by or for the financially destitute." *South Iowa*, 173 N.W.2d at 531. We specifically said in *South Iowa* that "[r]oom gifts and monthly payments by those who are able to pay are not the sole criteria by which we may ascertain whether the use" is charitable. *Id.; accord Milwaukee Protestant Home*, 41 Wis.2d at 297–98, 164 N.W.2d at 295–96 (such fees are acceptable when "reasonably required" by the situation and used for charitable purposes).

■ Substantial evidence exists to show that Northcrest has used its fees only for charitable purposes. It has no policy against admitting those unable to pay the full fees and has, in fact, admitted persons who could not pay in full. Further, Northcrest even guarantees lifetime care to any resident who becomes destitute; no evidence suggests Northcrest is unable to fullfil this latter obligation.

That Northcrest seeks to ascertain whether an applicant will be able to pay at least some of the fees simply shows prudence and is not an indication of commercial intent. It has long been a part of Iowa law that the *"partly* gratuitous" care of certain persons is a charitable activity. *E.g., Andrews v. YMCA*, 226 Iowa 374, 383, 284 N.W. 186, 191 (1939) (emphasis added). The clear meaning here is that beneficiaries can be required to defray some of the costs of charitable services.

■ Finally, Richards argues Northcrest is not a charitable institution because contributions to it come largely from residents and are such a small percentage of the operating budget that costs to residents are not significantly defrayed. We disagree.

First, it must be noted that, as the director found, no evidence indicates that contributions from residents were anything but voluntary and charitable. The IRS considers them so for federal deductability purposes, and they have, in fact, been used for purposes which benefit all residents, rather than just those who have made contributions.

■ Next, we must disagree with Richards because there is no necessity under the law that charitable contributions form a certain threshold percentage of an institution's budget before the institution can be considered charitable. It is, however, important that contributions of money, goods, and services have played *some* part in the establishment and operation of a charitable institution. *See Evangelical Lutheran*, 200 N.W.2d at 512.

Northcrest has clearly had the benefit of such contributions. It received substantial donations of money, goods, and services at the time of its founding. Since then, although cash contributions have not added a large amount to Northcrest's income, the evidence shows that such contributions have been steady, especially from entering residents in the form of development fund contributions, which the director found to be legitimately charitable. Thus, while not great in magnitude, these donations have inevitably defrayed some of the costs the residents themselves would otherwise have borne.

More significant in value than cash donations have been contributions of services. The director found that a wide variety of individuals and groups have contributed services, which one witness estimated to have been worth perhaps half a million dollars since Northcrest's founding. These free services have defrayed some of the residents' costs, since the services would

**354**

otherwise have been paid for by the residents.

In addition, it is worth noting that Northcrest has, by helping its residents directly, also lessened the government's burden of caring for elderly persons, as former Governor Blue testified. Assisting the government in this way is indicative of a charitable status under our statute. *See Dow City,* 230 N.W.2d at 499.

Richards, with his well-formulated pro se arguments, should be commended for his interest in the local taxation process. This interest by a taxpayer is undoubtedly what the legislature intended, in part, to encourage when it enacted section 427.1(26). But Richards' view of what constitutes charity corresponds more closely to the old idea of charity being the free care of the indigent, rather than the current, broader definition which Iowa law has adopted. Under the relevant legal factors it is clear that substantial evidence exists to support the director's decision. The district court did not err in affirming that decision.

III. *Costs.*

Richards asks that we tax costs to the department, regardless of our decision on the merits. We must reject his request. As the district court properly said, once Richards brought his claim into a judicial forum, the usual rule pertaining to costs must be followed: they are recoverable by the successful party against the losing party. *See Eller v. Needham,* 247 Iowa 565, 569, 73 N.W.2d 31, 33 (1955); Iowa Code § 625.1; *accord* 20 C.J.S. *Costs* § 8, at 266 (1940).

IV. *Disposition.*

Richards raised reasonable questions about whether the actual use of Northcrest's property and the financing of its operations were consistent with a charitable status, and these questions were well worth consideration by local authorities, the department, and the courts. Despite the potential merit of Richards' arguments, the evidence is adequate for a reasonable mind to reach the same conclusion as the director, that Northcrest is indeed a charitable institution. Because we find that substantial evidence exists to support the

director's conclusion, we must affirm the district court's decision to uphold the director. Costs are taxed to Richards.

AFFIRMED.