BETHESDA FOUNDATION, Appellee,

v.

BOARD OF REVIEW OF MADISON COUNTY, Iowa; Lowell Olson, Chairman of the Board of Review of Madison County, Iowa; Catherine A. Weltha, Madison County Assessor; and County of Madison, State of Iowa, Appellants.

No. 88–900.

Court of Appeals of Iowa.

Jan. 25, 1990.

As Corrected April 26, 1990.

A. Zane Blessum, County Atty., for respondents-appellants.

John D. Lloyd of Reynoldson, Van Werden, Kimes, Reynoldson, Lloyd & Wieck, Osceola, for petitioner-appellee, and Stephen T. McGill and Robert L. Lepp of McGill, Parsonage & Lanphier, P.C., Omaha, Nebraska.

Heard by OXBERGER, C.J., and DONIELSON and SCHLEGEL, JJ.

DONIELSON, Judge.

Bethesda Foundation (Bethesda) is a nonprofit organization incorporated in Nebraska. The Bethesda Care Center in Winterset, Iowa, is owned by Bethesda and it includes intermediate (ICF) and residential (RCF) care facilities and apartments for the elderly. The Winterset facility employs ninety people and utilizes the services of fifty-six volunteers. As of the date of the trial court proceedings, Bethesda owned thirty health care facilities in seven states and operated two others under lease and management agreements. Bethesda claims it runs all of its facilities as nonprofit operations.

Pursuant to Iowa Code sections 427.1(9) and (10), Bethesda applied for a property tax exemption for 1986 and 1987 for the ICF and RCF portions of its Winterset facilities. It did not seek exempt status for

its apartments. The Madison County Assessor denied the exemption. The Board of Review for Madison County (Board) also denied the exemption. Bethesda then filed this suit in district court, claiming the property should be exempt from property taxes because it was owned and used for religious and charitable purposes. The court concluded the ICF portion of the center was exempt from taxation in 1986 and 1987; the RCF was not exempt because it provided no gratuitous or partly gratuitous care to its residents. The court remanded the case to the county assessor to allow the assessor to prorate the property assessment between the ICF and the RCF.

The Board appeals the district court's decision. It contends the court did not have the power to remand the case to the county assessor. The Board asserts under section 441.43 the court must either approve or modify the board's decision and remand is not an option.

The Board agrees the gratuitous or partly gratuitous care of elderly persons is a charitable purpose. The Board argues, however, that the Bethesda Care Center does not provide sufficient gratuitous care to qualify as a charitable institution. The Board points to the fact the care center does not use donations to pay for ongoing expenses and it uses no more volunteers than other for-profit nursing home facilities.

The Board also claims the care center is actually run with a view to pecuniary profit. Bethesda has plans to sell the care center and will receive a gain from the sale when it does so. Bethesda commingles the funds it receives from the Winterset care center with those of its entire operation. The Board argues employees of Bethesda receive extensive bonuses and excessive salaries.

By a supreme court order of May 10, 1989, the Board's motion to assess certain costs to Bethesda involving the appendix is to be submitted with the appeal.

**I. *Scope of Review.*** Our review is de novo. *Atrium Village v. Board of Review*, 417 N.W.2d 70, 72 (Iowa 1987). We strictly construe the statutes exempting property from taxation. *Id.* "[T]axation is the rule and exemption the exception." *Congregation B'Nai Jeshurun v. Board of Review*, 301 N.W.2d 755, 756 (Iowa 1981), (quoting *Trustees of Griswold College v. State*, 46 Iowa 275, 278 (1877)). The current trend is to curb and restrict property tax exemptions. *Id.*

Any doubt concerning an exemption must be resolved in favor of taxation. *Atrium Village*, 417 N.W.2d at 72. The burden is upon the party claiming the exemption to show the property should not be taxed. *Id.*

Exemption statutes are premised on the theory that the benefits received by the community from the facility outweigh the inequality caused by exemption of the property from taxation. *Id.* See also *Richards v. Iowa Dept. of Revenue*, 414 N.W.2d 344, 351 (Iowa 1987) (exemption statutes are legislative recognition of benefits received by society and of the lessened burden on government). The relevant portions of the exemption statute at issue in this case provide:

> The following classes of property shall not be taxed:
> *Property of religious, literary, and charitable societies.* All grounds and buildings used or under construction by ... charitable, benevolent, ... and religious institutions and societies solely for their appropriate objects, ... and not leased or otherwise used or under construction with a view to pecuniary profit.

Iowa Code § 427.1(9) (1987).

**II. *"Charitable" Institution.*** The general trend of authority in cases determining the charitable character of institutions for tax exemption purposes, veers away from the old concept that charity is confined to the "free" care of the indigent, and toward the idea of charity as comprehending all humanitarian activities. *Richards*, 414 N.W.2d at 351, quoting Annotation, *Receipt of Pay From Beneficiaries as Affecting Tax Exemption of Charitable Institutions*, 37 A.L.R.3rd 1191, 1197 (1971). "Our case law makes it clear that the gratuitous or partly gratuitous care of the

elderly is a charitable purpose." *Twilight Acres Inc. v. Board of Review*, 346 N.W.2d 40, 41 (Iowa App.1984). *See also South Iowa Methodist Homes, Inc. v. Board of Review*, 173 N.W.2d 526, 532 (Iowa 1970); *Evangelical Lutheran Good Samaritan Society v. Board of Review*, 267 N.W.2d 413, 415 (Iowa App.1978).

 Factors relevant to proving an institution is charitable include whether it received a federal tax exemption based on charitable status and whether the institution's articles of incorporation reveal charitable purposes. *Richards*, 414 N.W.2d at 351. It is conceded the Bethesda Foundation meets both of these requirements. However, when determining the charitable status of an institution, the actual use of a facility is more important than its stated purpose. *Id.* The mere fact that an institution is a nonprofit corporation does not make it a charitable institution under section 427.1(9). *Dow City Senior Citizens Housing, Inc. v. Board of Review*, 230 N.W.2d 497, 499 (Iowa 1975). In challenging Bethesda's status as a charitable institution, the Board points to the fact that 1) donations and gifts did not play a crucial role in the acquisition of the Winterset facility nor in its continuing operations; 2) services provided by its volunteers are no different than found in for-profit facilities; and 3) approximately fifty percent of its patients' care is paid for by government entitlements (Title XIX).

 Our supreme court has held there is no necessity under the law that charitable contributions form a certain threshold percentage of an institution's budget before the institution can be considered charitable. *Richards*, 414 N.W.2d at 353. However, it is important that contributions of money, goods, and services played some part in the establishment and operation of a charitable institution. *Id.* The record reveals Bethesda purchased the Winterset facility in 1981 for $1,276,500 from a for-profit organization. While the purchase of the Winterset care center was not the result of local fund raising and donations, it was purchased by an organization which traces its beginnings to 1960 when the personal contributions of

a minister produced a nursing home in Bassett, Nebraska. As the need for similar homes grew, so did Bethesda's ability to build and purchase the facilities. We cannot find the circumstances of Bethesda Care Center's acquisition lessens its status as a charitable institution. The record reveals the Winterset facility accepts and has received gifts and donations. While these contributions add only minimally to Bethesda's income, they do enable the Winterset facility to be less "institutional" in appearance and provide a more welcoming and comfortable atmosphere for its residents.

Related to the issue of donations is the contribution of services numerous volunteers provide the Bethesda Care Center. Their generous donations of time and resources provide numerous benefits to the residents. It is without question these contributed services play an important part in the operation of the care center. The fact that volunteers similarly assist for-profit nursing homes does not diminish the effect these services have in determining Bethesda's charitable status.

The Board argues the receipt of Title XIX payments by the care center contradicts a finding that it is a charitable organization. The record reveals the care center does not discriminate in its ICF between private-pay and Title XIX patients and Medicaid payments do not cover the full per-diem costs of care for each patient. Furthermore, no Bethesda patient has been denied continued care because of inability to pay, and the costs of some services not covered by Title XIX are absorbed by the center. A similar factual scenario existed in *Twilight Acres, Inc.*, and it apparently had no bearing on finding that nursing home was used for charitable purposes. *Twilight Acres, Inc.*, 346 N.W.2d at 41–42. As the trial judge aptly noted, the present-day realities of nursing home financing present the situation of double subsidization by taxpayers. Many nursing homes will receive Title XIX payments at taxpayer expense, and they will also be exempted from property taxes on their facilities. As the trial judge recognized, the issue of whether the costs of double subsidization is

outweighed by the benefits generated is best left to resolution by our legislature.

From our review of the record, it is apparent Bethesda Care Center provides its residents with medical and nursing care, meals, housekeeping and social activities. We have previously indicated the provision of such services and care reveals a charitable purpose. *Twilight Acres Inc.*, 346 N.W.2d at 41. Bethesda Care Center's ICF meets the requirement of "gratuitous or partly gratuitous care," *id.*, by virtue of its nondiscriminatory admissions policy and the fact that the Title XIX payments do not fully cover the per-diem costs of covered patients. *See id.* at 41–42. Under our current law, the factors in this case point toward a factual finding that the ICF portion of the Bethesda Care Center qualifies as a charitable institution.

■ **III. "View to Pecuniary Profit."** The Board claims Bethesda was operated with a "view to pecuniary profit" and should not be exempted from payment of property taxes. The Board points to the increased value of the Winterset facility, the commingling of the Winterset funds with those of the entire Bethesda Foundation, and the generous salary and perks provided to the Foundation's employees to demonstrate Bethesda was run with a view to making a pecuniary profit.

"Pecuniary profit" refers to monetary gain which inures to the benefit of private individuals and is not simply an excess of income over expenses. It is clear a charitable organization is not required to "run in the red"; its income may exceed expenses as long as the excess is not used for anything but charitable purposes. *Richards*, 414 N.W.2d at 352.

An increase in the value and equity in the Winterset facility does not demonstrate Bethesda was run with "a view to pecuniary profit." Inflation, good management, and improvements to the nursing home account for its increase in value. *See Twilight Acres, Inc.*, 346 N.W.2d at 42 (unrealistic to ascribe a pecuniary profit motive because of growth in equity).

The trial judge calculated Bethesda's rate of return as approximately 10% in 1986 and 9% in 1987. Prior decisions have recognized that rates of return from .1% to 6%, *Evangelical Lutheran*, 267 N.W.2d at 415, and from 6% to 14%, *Twilight Acres, Inc.*, 346 N.W.2d at 42, were not so excessive as to conclude a nursing home was operated with a view to making a pecuniary profit.

We find no support, nor does appellant cite any, which suggests the commingling of funds derived from the Winterset facility with the general funds of the Foundation defeats Bethesda's right to tax exempt status. Bethesda Foundation is a nonprofit organization; testimony revealed it does not run its nursing homes with a view to making a profit. No contradictory evidence was presented to show Bethesda's excess income was used for anything but charitable purposes and the reasonable compensation of its employees. In fact, evidence revealed over $450,000 has been reinvested in the Winterset facility since its acquisition.

The Board argues the officers and employees of Bethesda received excessive salaries, bonuses, and perks which demonstrate this was a profit-making enterprise. Testimony revealed the top officers in this organization received compensation which ranged from $51,000 to $114,000 in 1986 and $66,000 to $172,000 in 1987. Many of these officers had been with Bethesda for ten to eighteen years. Evidence presented at trial revealed Bethesda's levels of compensation were commensurate with other nursing home facilities.

The Foundation owns a condominium and a retreat facility near ski resorts in Colorado. These facilities were available for personal use by the foundation's officers and the administrators of the thirty-three nursing homes. These facilities were also used for meetings of administrators and department heads from each nursing home. Bethesda has an extensive bonus program used as an incentive for its staff. The "Ambassador's Club" is a program in which each nursing home selects a member of its on-line staff (i.e., a nurse's aid or housekeeper) to represent the facility at a retreat where they are instructed on the

goals and purposes of Bethesda. The "President's Club" represents the top one-third of the nursing home administrators. From that group, one individual is chosen as "Administrator of the Year." Cash and trip bonuses act as incentives to motivate administrators to attain these honors. The Board makes much of trips the administrators take, but we note that three of the trips taken by Eva McDonald, administrator of the Winterset facility, were for administrator's meetings.

As the trial judge noted in his ruling, expert witnesses testified the compensation paid to Bethesda's officers and employees was reasonable and necessary to retain competent personnel. There was no testimony indicating the compensation and perquisites provided by Bethesda were unreasonable. If an organization of this size (2,700 residents, 2,300 employees and thirty-three separate health facilities) is to be well managed, as the trial judge found Bethesda was, it must compete to attract and retain good personnel. The employee benefits available in this case are designed to be competitive and are not unreasonable. The trial judge did not err in finding Bethesda was not operated with a view to pecuniary profit.

■ **IV. Remand.** Iowa Code section 441.43 (1987) provides upon appeal from an action of a board of review fixing the amount of assessment, a court may increase, decrease, or affirm the amount of the assessment. This statute has been construed to mean when a board of review sets forth a valuation for property, the district court must affirm, increase or decrease the award, it may not remand for further valuation. *Cablevision Associates VI v. Board of Review,* 424 N.W.2d 212, 214 (Iowa 1988). The district court erred in remanding this case to the county assessor.

■ The parties in this action stipulated as to the value of the land, the apartments, and the care center. However, no assessment was ever made as to the separate ICF and RCF portions of the care center. Evidence was presented describing which portions of the facility were used for ICF and RCF purposes, but no assessment was ever

made as to their separate values, and no evidence was offered from which the trial court could accurately assess the value of these separate portions.

■ When a record in an equity case is not in a condition which would allow a final decision, the general rule is to remand the case to the district court for the taking of additional evidence. *Id.* This case is remanded to the district court. It shall receive additional evidence regarding the value of the ICF, RCF, and chapel portions of the care center. Specific values will be assigned each portion with only the RCF being subject to taxation.

■ **V. Cost of Producing Appendix.** Pursuant to Iowa R.App.P. 15(b), the Board has asked this court to assess costs against Bethesda for unnecessarily including material in the exhibit appendices. Costs may be assessed for appendix materials which are unnecessary or have no bearing on the issues appealed. *See State v. Oppelt,* 329 N.W.2d 17, 21 (Iowa 1983); *Hegtvedt v. Prybil,* 223 N.W.2d 186, 190 (Iowa 1974); *Coppola v. Jameson,* 200 N.W.2d 877, 881 (Iowa 1972).

■ We recognize the record in this case was voluminous and contained many exhibits. We are aware the appellee would wish to include in the appendices whatever information was necessary to prove it was a charitable institution not operated with a view to pecuniary profit. However, much of the documentation the appellee included in the exhibit appendices was unnecessary and merely replicated transcribed testimony also found in the appendix.

We have examined the exhibit appendices and have found much of that material to have been unnecessary, including: items stipulated to by the parties (i.e., the non-profit nature of the foundation and its IRS status), pictures of the care center and its residents, reproduction of rules from the Iowa Administrative Code, calendars listing activities scheduled at the center, minutes from residents' counsel meetings, and brochures and newsletters which contained no information relevant to disposition of this appeal. Our examination of the exhibit

appendices reveals 455 unnecessary pages. This constitutes approximately eighty percent of the exhibit appendices' contents. Appellee, Bethesda Foundation, is hereby assessed eighty percent of the costs to produce the exhibit appendices. The exhibit appendices cost $2,268.00; appellee will pay $1,814.40 of this expense.

AFFIRMED AND REMANDED WITH DIRECTIONS.