CARE INITIATIVES f/k/a Mercy Health Initiatives, Appellant,

v.

BOARD OF REVIEW OF UNION COUNTY, IOWA, William Ray, Chairperson, Appellee.

No. 91–1627.

Supreme Court of Iowa.

May 19, 1993.

Terry L. Monson, David Swinton and Andrew J. Bracken of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, for appellant.

Frank W. Pechacek, Jr. and Randy R. Ewing of Smith, Peterson, Beckman & Willson, Council Bluffs, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, LAVORATO, and ANDREASEN, JJ.

ANDREASEN, Justice.

Appellant Care Initiatives (Care) is a nonprofit corporation which owns or leases forty-one nursing homes including its Creston, Iowa, nursing home facility, Creston Manor Care Center (Creston Manor). The question raised in this appeal is whether Care is entitled to a charitable exemption from property taxes as provided in Iowa Code section 427.1(9) (1989) on Creston Manor.[1] The county assessor, the county board of review, and the district court in turn have denied the exemption. We agree.

I. *Background.*

Creston Manor, along with forty-four other Iowa facilities, was previously owned by Beverly Enterprises (Beverly), a for-profit corporation and one of the largest nursing home operators in the United States. In 1988, Beverly, who was facing financial difficulties, sought to divest its nursing homes in Iowa, South Dakota, Nebraska and Arkansas. Beverly contacted Bruce H. Whitehead. Whitehead had prior experience in the acquisition and development of nursing homes. He was the founder, sole stockholder and president of Britwill Company, a Texas for-profit corporation organized in 1985 as a health care—real estate management company. Britwill and the Bruce H. Whitehead Irrevocable Trust I formed a limited partnership in Texas called Ventana Investments (Ventana). Britwill was the managing partner of Ventana.

On May 24, 1989, Ventana entered into an agreement with Beverly to purchase forty-five Iowa nursing home facilities.[2] To obtain 100% leveraged financing to purchase the Iowa facilities, Whitehead used a nonprofit corporation funded by tax exempt revenue bonds. Care was one of several inactive Internal Revenue Code section 501(c)(3) corporations, exempt from federal income tax, awaiting use as vehicles to obtain tax exempt bond financing to fund acquisition transactions. Care was incorporated in Texas in May 1988 as a nonprofit corporation.[3] The initial board of directors were Richard Young, an investment banker, Terry Colip, an investment banker, and Terry Colip's brother, Greg Colip. Prior to the acquisition of the Iowa nursing homes, Care had no assets and had conducted no business.

Care acquired the Iowa facilities in a two-step transaction. Ventana purchased the forty-five Iowa nursing home facilities from Beverly for $57,000,000. Ventana then agreed on June 19, 1989, to sell forty-one of the forty-five facilities to Care for $63,500,000. Earlier that day, the initial board of directors stepped down and elected Duncan Graham, an insurance salesman and former pastor, Hulon Walker, part owner of a nursing home management company and former nursing home administrator, and Ronald Harmon, an engineer and corporate officer, as their replacements. Care's newly elected board then adopted resolutions approving the purchase transaction and executed necessary trans-

1. This is one of thirty cases pending in the state involving thirty-six nursing home facilities owned by Care.

2. Beverly owned forty-one facilities and leased and operated an additional four facilities.

3. The corporation's name at the time of incorporation was Mercy Health Initiatives. The name was changed to Care Initiatives in December 1990.

action documents. The actual transfer of ownership of the Iowa facilities to Care was completed on August 1, 1989.

On June 19, 1989, Care also contracted with Britwill to manage and operate the nursing facilities it had agreed to purchase. Upon completion of the purchase, Britwill assumed the actual operation of the Iowa facilities. Britwill hired virtually all of the 3100 Beverly employees who had been operating the Iowa facilities. Care's only employee is its President and CEO, Graham, who was hired in April of 1990.

Under the management contract, Care pays Britwill to manage the day-to-day operations of all Care facilities. The management agreement provides, in part: Britwill cannot be terminated during the first three years of the contract except "for cause"; Britwill keeps all Care's books; Britwill maintains all accounts receivable and disbursements, no Care board member can expend Care funds; Britwill has a "right of first refusal" on all Care facilities; and the Care board is not permitted to have a formal board meeting without providing Britwill an opportunity to attend. By separate agreement, Britwill performs all of Care's data processing services.

Care is obligated under the contract with Britwill to pay an annual management fee of $196,000 per month with an additional amount to be paid on a percentage of gross operating revenues. The fee paid Britwill for management services in 1990 was $2,665,000. In addition, Care paid Britwill $600,000 for data processing services.

Care filed a claim for tax exemption of the Creston Manor property with the Union County assessor in January, 1990. The application stated the property is used for charitable and benevolent purposes as a nonprofit nursing home. It is not operated for pecuniary profit and is exempt from taxation. A petition for review was filed after the assessor denied the application. When notified that the board of review had upheld the assessor's decision, Care appealed to the district court. The appeal was heard in district court beginning July 9, 1991, through July 17. The district court filed its findings of fact, conclusions of law,

and judgment on September 13, 1991. The court concluded Care was not entitled to a property tax exemption. Care appeals.

II. *Standard of review.*

Tax exemption appeals are equitable in nature, *South Side Church of Christ v. Des Moines Board of Review*, 243 N.W.2d 650, 651–52 (Iowa 1976), therefore, our review is de novo. Iowa R.App.P. 4. While we are not bound by the trial court's findings of fact, we give them weight. *See* Iowa R.App.P. 14(f)(7).

Care asks that we give little weight, if any, to the findings and conclusions of the trial court because the court adopted verbatim the twenty-one page proposed findings of fact, conclusions of law, and judgment submitted by the board of review. We have criticized the trial court's ex parte request of counsel to submit proposed findings. *See Production Credit Ass'n v. Shirley*, 485 N.W.2d 469, 475 (Iowa 1992); *Kroblin v. RDR Motels, Inc.*, 347 N.W.2d 430, 436 (Iowa 1984). Here, however, the court requested both parties to submit proposed findings, conclusions and judgment following trial. Although we have not encouraged courts to adopt findings and conclusions prepared by counsel, we do not apply a separate standard of review when the court does so. *Shirley*, 485 N.W.2d at 471.

III. *Property tax exemption.*

Iowa Code section 427.1 describes a number of classes of property which are exempt from taxation and provides in part:

The following classes of property shall not be taxed:

(9) *Property of religious, literary and charitable societies.* All grounds and buildings used ... by ... charitable, benevolent, ... institutions or societies solely for their appropriate objects ... not leased or otherwise used ... with a view to pecuniary profit.

The rules of construction for tax exemption statutes are well settled.

We strictly construe the statutes exempting property from taxation. Any doubt

concerning an exemption must be resolved in favor of taxation. The burden is upon the party claiming the exemption to show the property should not be taxed.

*Atrium Village v. Board of Review*, 417 N.W.2d 70, 72 (Iowa 1987) (citations omitted). In our analysis, the actual use of the property is the paramount consideration. *Id.*

We give the term "charitable" in the tax exemption statute a broad definition. *Richards v. Iowa Dep't of Revenue*, 414 N.W.2d 344, 351 (Iowa 1987). The term "pecuniary profit" refers to monetary gain which inures to the benefit of private individuals. *Bethesda Found. v. Board of Review*, 453 N.W.2d 224, 228 (Iowa App. 1990).

## IV. *Charitable use.*

The present appeal is the second property tax exemption case involving Care to reach Iowa's appellate courts. Care's Ridgewood Care Center facility in Ottumwa, Iowa, has previously been denied a property tax exemption. *Care Initiatives v. Board of Review*, 488 N.W.2d 460, 463 (Iowa App.1992). The court of appeals concluded that Care had not shown by a preponderance of the evidence that the facilities were not used with a view to pecuniary profit. *Id.* However, in determining whether Creston Manor satisfies the statutory requirements for tax exemption, we make an independent evaluation of the use of the property by Care.

Here, we must determine if the owner has established a charitable use of the property, not a use for monetary gain which inures to the benefit of private individuals. Among the factors we consider significant are the establishment and operation of the institution, the policies and practices relating to admission and retention of residents, the community support, and the benefits provided to the community.

### A. Establishment and Operation of Creston Manor.

Care is a nonprofit corporation with a temporary federal income tax exemption. Its stated purposes are charitable. Although the incorporator of Care was Greg Colip, two of the three initial directors, Terry Colip and Richard Young, were investment bankers. The initial board of directors of Care selected a new board on June 19, 1989. On that date the new board adopted resolutions to purchase the forty-one Iowa nursing homes for $63,500,000, to finance the acquisition and renovation of the facilities by loan with the Iowa Finance Authorities and the sale of $85,950,000 of tax exempt bonds through a designated underwriter, and to execute a management agreement with Britwill. Although the sale to Care had not been finalized, Graham, the newly elected President of Care, admitted as a practical matter, the deal was pretty well cut and was already in place by the time the board acted on June 19, 1989. Present at the board meeting were Whitehead, his attorney Tyrell Garth, and the bond underwriters.

Two of the initial directors, Terry Colip and Richard Young, each realized approximately $2,555,000 gross profits out of the fees paid to the underwriters, Underwood, Neuhaus & Co., Incorporated, on the bond sale. After acquiring the Iowa nursing home facilities from Beverly, Whitehead and his company Ventana realized on the sale to Care a gross profit of $6,500,000 plus Ventana retained four Iowa nursing home properties.

Under the management contract Britwill controls all day-to-day operations of Creston Manor. Britwill established policies and procedures including admission, discharge and transfer rights, quality of care, and the facility rate structure. The new board meets quarterly. The directors currently receive $1500 per board meeting plus expenses. Care's only employee, Graham, is paid $65,000 annually plus other benefits.

Although it is not necessary that charitable contributions form a certain threshold percentage of an institution's budget before the institution can be considered charitable, it is important that contri-

butions of money, goods, and services play some part in the establishment and operation of a charitable institution. *Richards,* 414 N.W.2d at 353. As we have stated:

A statutory exemption does not depend alone on lofty or generous motives on the part of the donor. Although such motives are almost always involved in charitable institutions, something more is required in order to qualify for a property tax exemption.

*Atrium Village,* 417 N.W.2d at 73. Here, no contribution of money, goods, or services was made in the establishment of Care or the acquisition of Creston Manor. Care's initial capitalization consisted entirely of debt. The sale of revenue bonds raised $85,950,000. In addition, Care secured $6,401,000 by loan from Ventana and the bond underwriters. Although Care is the owner, the board has surrendered almost all control of the operation to Britwill. These factors weigh heavily against Care's claim for exemption.

B. Policy and Practice.

Care's general policies as implemented by Britwill apply to all Iowa facilities. Care has a policy to accept patients for admission without regard to their ability to pay. No financial statements or third-party guarantees are required. Room, gifts, endowments, or other lump-sum payments are not expected. No patient has ever been rejected for admission to Creston Manor because they could not afford to pay nor has any patient been discharged under such circumstances. Creston Manor does not discriminate between private pay and Title XIX patients. These facts indicate a charitable purpose and support the exemption claim. *See Bethesda,* 453 N.W.2d at 227.

C. Community Support.

In 1990, Creston Manor recorded nearly 5300 hours of volunteer services donated to the facility to enhance the quality of life and care for Creston Manor residents. This is approximately the same level of volunteer help received when the home was operating for profit by Beverly. The fact that volunteers assist for-profit nursing homes does not diminish the effect these services have in determining the charitable nature of the nursing home. *Id.*

D. Community Benefits.

Care claims it provides uncompensated care to the community and its residents. It does so by charging Title XIX patients, who account for forty-two percent of Creston Manor's residents, discounted rates. Care calculated it provided uncompensated care of $4.68 per patient day at Creston Manor totaling approximately $52,490 in 1990. However, the Iowa Department of Human Services (DHS) calculated the actual cost per patient day for Creston Manor as $42.30, compared with Care's calculation of $48.05. The Title XIX reimbursement rate for 1990 was $43.37 at Creston Manor; $1.07 higher than DHS' calculated average cost per patient day. Furthermore, the marginal cost per patient day of caring for Title XIX patients was $37.39 for Creston Manor; $5.98 less than the Title XIX reimbursement rate.

Care urges its acceptance of "hardship" cases, patients who are not able to afford the full private pay rates and who fail to qualify for Title XIX, is charitable. However, Creston Manor has admitted only one "hardship" patient, and that patient was charged a rate in excess of the Title XIX rate and calculated on a thirty-day month, more than Care's calculated average cost.

V. *Conclusion.*

Based upon our de novo review of the record, giving weight to the findings of fact made by the district court, we agree Care does not qualify under our statute as being used for charitable and benevolent objectives. The district court decision to uphold the denial of the exemption is affirmed.

**AFFIRMED.**