**FRIENDSHIP HAVEN, INC., Appellant,**

v.

**WEBSTER COUNTY BOARD OF REVIEW, Appellee.**

No. 94–1659.

Supreme Court of Iowa.

Jan. 17, 1996.

Mark R. Crimmins and Brian L. Yung of Bennett, Crimmins & Yung, Fort Dodge, for appellant.

Frank W. Pechacek, Jr. and Scott D. Strait of Willson & Pechacek, P.L.C., Council Bluffs, for appellee.

Considered by McGIVERIN, C.J., and CARTER, NEUMAN, SNELL, and TERNUS, JJ.

CARTER, Justice.

Friendship Haven, Inc. (Friendship Haven), a nonprofit corporation that operates housing facilities and multilevel care facilities for the elderly in Fort Dodge appeals from a decree confirming the action of the Webster County Board of Review (board of review) in denying an exemption from the general property tax for a portion of the corporation's housing facilities. After reviewing the record and considering the arguments presented, we affirm the district court's decree.

Friendship Haven is a continuing care retirement community (CCRC) located in Fort Dodge, Iowa. Friendship Haven, Inc. is exempt from state and federal income taxes, and until recently, the entire facility has been exempt from property taxes. Friendship Haven is comprised of various buildings and facilities. One of these facilities is known as "the cottages." Beginning with the 1993 assessment year, the board of review revoked the tax exempt status of that portion of the corporation's real estate in Webster County on which the cottages are located. This action was based on the determination of the assessor and the board of review that this particular property was not being used for charitable purposes as contemplated by Iowa Code section 427.1(9) (1993).

In 1948, the original tract of land upon which Friendship Haven is located was donated by the Fort Dodge Betterment Foundation. In 1961, an additional three acres were acquired from the same organization. In July of 1951, Friendship Haven, Inc. was organized, and it received a letter from the United States Department of Treasury granting it exemption from taxation as a nonprofit organization. Initial funding for Friendship Haven was raised from donations

from business people in Fort Dodge as well as from church parishioners.

Friendship Haven is comprised of several buildings referred to as the "East Building," the "West Building," "Tompkins Memorial Health Center," the "chapel," and the "cottages." The East Building and the West Building are used for independent assisted living and helpful living. An advance room gift of $12,000 is requested for admission to these facilities. The Tompkins Memorial Health Center offers a full range of professional services from physical therapy and pharmacy to individual activities, including a special Alzheimer's unit. All care is by a professional nursing staff under the direction of a resident physician. Nursing care costs are in the range of $55 to $75 per day.

The concept underlying the cottages is to further the ability of the occupants to live independently. Those individuals who are still able to live on their own can live in the cottages and function independently while also taking advantage of the various retirement services provided. Then, as time goes on, these individuals can move from the independent atmosphere of the cottages to one of the direct care facilities that are a part of the Friendship Haven complex. Presently, there are forty-four cottages that are owned and operated by Friendship Haven. An "endowment" or entrance fee is charged to the occupant when they enter a cottage. These fees range from $35,000 to $55,000 per unit. In addition to the "endowment," a monthly service fee is charged, which ranges from $340 to $390. Additional costs include fees for a second person sharing the cottage and costs such as cable television and phone service.

The cottages were added in various stages between 1977 and 1985. They are available in a variety of bedroom, bathroom, and garage combinations. Two of the cottages include three bedrooms, ten include one bedroom, and thirty-two include two bedrooms. They range in size from 810 square feet to 1576 square feet. The total construction cost of the cottages, in six phases, was $2,665,263. The unit cost varies from $43,812 to $127,412. Endowments received for the cottages have totaled $2,328,000, which is eighty-eight per-

cent of the construction cost. A unit's lifetime turnover is estimated at six and one-half times. The estimated average individual turnover is ten to thirteen years. Of the 615 persons residing in the Friendship Haven complex, only sixty live in the cottages.

A party interested in obtaining residence at Friendship Haven, whether it be at the cottages or at one of the other facilities, follows a prescribed application policy. An application that requests information regarding the age of the applicant, a financial form, and a physician contact must be filled out. If an applicant is interested in living in a cottage, they are placed on a waiting list. Friendship Haven asserts that it places the applications in chronological order pursuant to the order in which they are received. When a cottage becomes available, the applicant is informed of the opening. Friendship Haven maintains that the applicants are informed that, if they cannot afford the endowment, they are still eligible to reside in the cottages. Such statements are not given in writing.

There is no formal written admissions policy for the Friendship Haven cottages. There is a mission statement for the integrated Friendship Haven facility that states as follows:

> It is our purpose to enhance and enrich the lives of our residents in a way that will add quality and security to their life-style. Various levels of health care, social and religious opportunities will be provided for the differing stages of the aging process. The Haven is committed to a charitable ministry of the United Methodist Church to which it is related by faith. It is open to all persons, both residents and employees, regardless of race, creed, sex, color, economic background or national origin. Further, it is committed to preparing professionals to work effectively in providing needed and appropriate human services.

Persons requesting information about Friendship Haven's admission policies are provided a copy of the annual report, which includes the mission statement. This report also outlines the services available to residents of the cottages and discusses the cost to each resident. It does not mention alter-

native payment schedules for financially needy applicants for the cottages. Descriptions of the "East" and "West" buildings do refer to a "Plan 2" that sets forth alternative payment methods if a resident cannot afford the entrance fee. Thus, although alternate payment options are set out for residents in the "East" and "West" buildings, such is not the case regarding the cottages.

Since the cottage facilities have been constructed only two cottages have been occupied by people who were in need of financial assistance and whose endowments and monthly fees have been waived. One of these cottages was occupied by a retired Methodist minister and his wife. The other was occupied by the mother of the secretary of a longtime president of the board of trustees of the corporation.

The district court concluded that Friendship Haven is in all likelihood a charitable institution when its entire vertical operation is considered. That circumstance, the court believed, is consistent with a substantial portion of the facility being granted an exemption by the local assessor and board of review. The court was not convinced, however, that the real estate on which the forty-four cottages are located was being used for charitable purposes.

The district court based its determination on several factors. These include: (1) Friendship Haven can only identify two persons who have not paid the substantial endowments required in order to obtain the benefit of these housing units. That number is an insignificant percentage of those who have occupied the cottages. (2) Although Friendship Haven has stated that its policy is to accept anyone for cottage occupancy, the historical facts suggest that it has not. Nor does it point to anyone on the waiting list that is unable to pay the endowment or the monthly rental fees. (3) Using a reasonable accounting method, including amortization of the endowments and excluding some depreciation, reflects a sizeable annual excess of income over revenues. Yet, Friendship Haven continues to annually raise the monthly fees with few exceptions. (4) The occupants have opted to reside there because they require few services and expect that this will continue to be true. (5) The housing and care services that are provided to the cottage occupants benefit persons who are quite capable of paying for these benefits.

■■■ Under Iowa Code section 441.39, the district court, sitting in equity, shall determine anew questions arising before the board of review that relate to the liability of the property for assessment. This court's review of the district court's decree is de novo. *Atrium Village v. Board of Review,* 417 N.W.2d 70, 72 (Iowa 1987). The statute under which Friendship Haven claims entitlement to an exemption from the general property tax provides:

■■■ The following classes of property shall not be taxed:

. . . .

9. ... All grounds and buildings used ... by ... charitable ... institutions and societies solely for their appropriate objects, not exceeding 300 acres in extent and not leased or otherwise used or under construction with a view to pecuniary profit.

Iowa Code § 427.1(9). There are three requirements that must be met in order to obtain an exemption pursuant to this statute. These are: (1) the property must be used by a charitable, religious, or educational institution or society; (2) the property must not be used with a view to pecuniary profit; (3) the actual use of the property must be solely for the appropriate objects of the institution or society. *Camp Foster YMCA v. Dickinson County Bd. of Review,* 503 N.W.2d 409, 411 (Iowa 1993).

In resolving this matter adversely to Friendship Haven, the district court did not conclude that the real estate on which the forty-four cottages were located was being used with a view to pecuniary profit. Rather, it denied exempt status to the forty-four cottages because of a finding that this portion of the corporation's real estate was not being used for a charitable purpose. We conclude that in so finding the district court was expressing the view that Friendship Haven had failed to establish the third element required by *Camp Foster* and earlier decisions.

■ We have recognized that it is the use of the property by the charitable organization that controls the granting of an exemption rather than the nature of the use by a particular occupant. *South Iowa Methodist Homes, Inc. v. Board of Review*, 173 N.W.2d 526, 532–33 (Iowa 1970). In order to qualify for an exemption under this "organizational use" standard, it is necessary for Friendship Haven to demonstrate either of the following propositions: (1) that the cottages afford a charitable benefit to their occupants, or (2) that within the integrated Friendship Haven facilities the cottages and various levels of care that are made available to occupants of the cottages are, as an integrated whole, a charitable activity. We conclude that Friendship Haven's evidence clearly failed to establish the first of these propositions. The district court found and we agree that, as a class, the occupants of the cottages are not the recipients of charity.

Our inquiry does not end at this point. We must also consider the claim that the cottages are so integrated with the remainder of the facility that in its "seamless care scheme" there is a subsidization of housing and care for the cottage residents. The district court found as follows with respect to this claim:

[T]he court concludes that when continuum of care in the East–West Buildings or the Tompkins Health Center is provided, those residents are no longer occupants of the cottages. In fact, unless the cause is a mere temporary illness, the vacated cottage would be occupied by another entrant, with a check for another endowment. When that person transfers to the other facilities of [Friendship Haven], he or she is residing in that portion of the [Friendship Haven] campus that is receiving a property tax exemption. When he or she remains an occupant of the cottages, the selling point is independent living with little interference. Though available, in fact, the residents of the cottages are not using many of the remaining facilities. True, there is physical and water therapy, but looking at the broad brush, the very reason the occupants chose to live in the cottages is its total independent living with Friendship Haven caring for the yard and cottage maintenance.

Although we agree with Friendship Haven's contention that exempt status may be established by an integrated facility that in its entirety provides charitable services to a substantial portion of its occupants, we also agree with the district court's finding that the cottages are not exempt on that basis.

■ We have already concluded that the use that Friendship Haven makes of the cottages does not extend charity to the occupants of those facilities. It is also apparent, we believe, that the corporation's operation of the cottages does not serve to extend charity to the other 555 occupants of Friendship Haven who do not reside in the cottages. If the occupants of the cottages receive continuing care services from Friendship Haven on a charitable basis, a fact asserted but not proven, it still would appear that the corporation's use of the cottages does not play a significant role in that charitable activity.

As a final matter, we consider Friendship Haven's contention that its exemption claim should be considered under the "less demanding requirement" test that was recognized in *St. Ambrose University v. Board of Review*, 503 N.W.2d 406 (Iowa 1993). In that case, we expressed the view that the actual-use test for establishing an exemption is a much less demanding requirement for those religious, educational, and charitable organizations who clearly qualify as such without regard to the use of the property at issue. *Id.* at 407. We conclude, however, that the less demanding requirement recognized in *St. Ambrose University* does not extend to a nonprofit corporation, which essentially carries out a unified operation at a single site. As to such corporations, both their charitable status and the taxable status of their property turns on activities related to a single purpose.

We have considered all issues presented and conclude that the district court's decree should be affirmed.

**AFFIRMED.**