**CARROLL AREA CHILD CARE CENTER, INCORPORATED,**
Appellee,

v.

**CARROLL COUNTY BOARD OF REVIEW, Appellant.**

No. 98–1047.

Supreme Court of Iowa.

July 6, 2000.

John C. Werden Jr., County Attorney, for appellant.

A. Eric Neu of Neu, Minnich, Comito & Hall, P.C., Carroll, for appellee.

TERNUS, Justice.

The appellant, Carroll County Board of Review, allowed a partial property tax exemption to the appellee, Carroll Area Child Care Center, Incorporated. On the Center's appeal to the district court, the district court granted the Center a full exemption. The Board appeals. Upon our de novo review, we affirm the district court.

I. *Background Facts and Proceedings.*

The Center is a non-profit corporation, established in 1978 pursuant to Iowa Code chapter 504A (1977). According to its articles of incorporation, the Center is to be operated exclusively for educational and charitable purposes. Its main function has been to provide quality day care services for persons in and about Carroll County. The Center has qualified for exemption from state and federal income taxation.

In 1996, the Center filed a claim for property tax exemption with the Carroll County assessor. *See* Iowa Code § 427.1(8) (1997) (providing that property of charitable institutions is exempt under certain circumstances). The assessor denied the Center's claim for exemption and assessed the property at its full value. The Center protested this assessment to the Carroll County Board of Review. *See id.* § 441.37(1)(c) (allowing dissatisfied property owner to protest an assessment on the basis that the property is exempt from taxation). The Board found that thirty per cent of the value was exempt. *See id.* § 427.1(14) para. 2 (providing for partial exemptions).

The Center appealed the Board's decision to the district court. *See id.* § 441.38(1) (permitting appeals to district court from actions of a board of review). After trial, the district court determined that the Center's property was fully exempt. *See id.* § 441.39 (stating that the district court "shall hear the appeal in equity and determine anew all questions arising before the board"). The Board has brought this appeal.

II. *Scope of Review.*

▮ "Tax exemption appeals are equitable in nature and, therefore, our review of the district court's decision is de novo." *Partnership for Affordable Housing, Ltd. Partnership Gamma v. Board of Review,* 550 N.W.2d 161, 163 (Iowa 1996); *see also* Iowa R.App. P. 4. Although this court is not bound by the trial court's findings of

fact, we give them weight, particularly when considering the credibility of witnesses. *See Care Initiatives v. Board of Review*, 500 N.W.2d 14, 16 (Iowa 1993); Iowa R.App. P. 14(f)(7).

### III. *Issues on Appeal.*

■ On appeal to this court, the Board argues, as it did in the district court, that the Center is entitled to no exemption, not even a partial one. We do not think the law permits the Board to challenge on appeal its own determination that the Center was entitled to a partial exemption from property taxation. In an early case under a predecessor statute, we held that a board of review could not argue on appeal that the assessment should be raised above the value determined by the board itself. *First Nat'l Bank v. City Council*, 136 Iowa 203, 208, 112 N.W. 829, 830 (1907); *see also* Iowa Code § 441.38(1) (providing for appeal from board's decision by property owner or assessor; no provision made for the board to challenge its own assessment); *Aerie 1287, Fraternal Order of Eagles v. Holland*, 226 N.W.2d 22, 25 (Iowa 1975) (holding that only issue before the appellate court was whether the partial exemption granted by the district court should be higher; in the absence of a cross-appeal, presumably by the assessor, court would not consider whether exemption should be less than that allowed).

We adhere to this principle in the case before us and hold that the Board may not take the position on appeal, either in the district court or this court, that its decision was wrong and that the assessment should be raised. Because the assessor did not appeal, the only issue to be considered is whether the Center is entitled to the partial exemption granted by the Board or to a full exemption as determined by the district court. We turn first to the governing legal principles.

### IV. *General Principles Governing Property Tax Exemptions.*

■ The Center's request for an exemption from property taxation is based on Iowa Code section 427.1(8):

The following classes of property shall not be taxed:

. . .

8. *Property of religious, literary and charitable societies.* All grounds and buildings used or under construction by literary, scientific, charitable, benevolent, agricultural, and religious institutions and societies solely for their appropriate objects, not exceeding three hundred twenty acres in extent and not leased or otherwise used or under construction with a view to pecuniary profit.

Authority for a partial tax exemption is found in section 427.1(14):

The assessor, in arriving at the valuation of any property of the society or organization, shall take into consideration any uses of the property not for the appropriate objects of the organization and shall assess in the same manner as other property, all *or any portion* of the property involved which is leased or rented and is used regularly for commercial purposes for a profit to a party or individual. If a portion of the property is used regularly for commercial purposes an exemption shall not be allowed upon property so used and the exemption granted *shall be in the proportion of the value of the property used solely for the appropriate objects of the organization, to the entire value of the property.*

Iowa Code § 427.1(14) para. 2 (emphasis added). We strictly construe these statutes and any doubt about an exemption is resolved in favor of taxation. *Care Initiatives*, 500 N.W.2d at 16–17.

This court has repeatedly held that an entity must prove the following three factors by a preponderance of the evidence to establish the tax-exempt status of its property:

(1) [the entity] was a charitable institution at the time of the claimed exemption,

(2) [the entity] did not operate [the facility] with a view to pecuniary profit, and

(3) the actual use of [the facility] was solely for the appropriate objects of the charitable institution.

*Partnership for Affordable Housing,* 550 N.W.2d at 164. *See generally Care Initiatives,* 500 N.W.2d at 17 (stating that party claiming the exemption has the burden of proof). Because the Board granted a partial exemption to the Center, it necessarily found that the Center was a charitable institution at the time it claimed exempt status. Due to the fact that the assessor filed no appeal from the Board's decision, we accept for purposes of our review that the Center qualifies as a charitable institution under chapter 427. *See Aerie 1287,* 226 N.W.2d at 25 (concluding that board's allowance of a partial exemption obviated need on appeal to determine whether the taxpayer qualified as a charitable organization). With respect to the second factor, the Board concedes in its brief that the Center is not operated with a view towards pecuniary profit.

That brings us to the third factor— whether the actual use of the Center's day care facility was solely for the appropriate objects of the institution. By virtue of the fact that the Board allowed a partial exemption, it obviously concluded that at least a portion of the facility was employed for appropriate charitable purposes, namely the care of children. Thus, the only issue in contention on this appeal is the extent to which the day care center was actually used for this charitable object.

V. *Applicable Legal Principles for Determining Whether Use of Property is Charitable.*

■ This court has referred to the requirement that the property be "used solely for the appropriate objects of the charitable institution" as the "actual use" test. *See St. Ambrose Univ. v. Board of Review,* 503 N.W.2d 406, 407 (Iowa 1993). Consistent with this characterization, in cases involving partial tax exemption, our courts have examined the extent to which the property was actually used for the charitable purpose. *See Aerie 1287,* 226 N.W.2d at 25; *Mayflower Homes, Inc. v. Wapello County Bd. of Review,* 472 N.W.2d 632, 633–34 (Iowa App.1991). Before we can undertake such an analysis, however, we must identify the nature and scope of the charitable purpose or use at issue. *See South Iowa Methodist Homes, Inc. v. Board of Review,* 173 N.W.2d 526, 531 (Iowa 1970) (noting that the first step is to determine what objects are charitable). This preliminary step is of particular importance here, because in the Board's view only child care provided to low-income families qualifies as a charitable endeavor. We turn to our prior cases for guidance on this matter.

A review of our prior cases demonstrates that this state is committed to a broad definition of "charity." *See Care Initiatives,* 500 N.W.2d at 17 ("We give the term 'charitable' in the tax exemption statute a broad definition."); *Richards v. Iowa Dep't of Revenue,* 414 N.W.2d 344, 351 (Iowa 1987) ("Iowa law has long embraced the broad view of charity."). As we noted in *Richards,* charity is not limited to providing assistance to the needy. 414 N.W.2d at 351; *accord South Iowa Methodist Homes,* 173 N.W.2d at 531 (noting that the recipients of charity need not be limited to the financially destitute to qualify for a charitable exemption). It encompasses "all humanitarian activities." *Richards,* 414 N.W.2d at 351 (quoting Elizabeth T. Tsai, Annotation, *Receipt of Pay From Beneficiaries as Affecting Tax Exemption of Charitable Institutions,* 37 A.L.R.3d 1191, 1197 (1971)). Such activities include " 'the gratuitous or partly gratuitous improvement of spiritual, mental, social and physical conditions of young people,' " as well as of the elderly. *Id.* (quoting *Andrews v. Young Men's Christian Ass'n,* 226 Iowa 374, 383, 284 N.W. 186, 192 (1939)).

In the past our court has considered two requested exemptions for child care facilities. *See Camp Foster YMCA v. Dickinson County Bd. of Review,* 503 N.W.2d 409, 410 (Iowa 1993); *St. Ambrose Univ.,* 503 N.W.2d at 406. These cases are not particularly helpful, however, because the child care centers under consideration were operated by entities who qualified as exempt institutions independent of their child care activities. *See Camp Foster,* 503 N.W.2d at 411 (facility was operated by the local YMCA to provide day care for children in the community); *St. Ambrose Univ.,* 503 N.W.2d at 407 (facility was operated by St. Ambrose University primarily for children of its employees and students). Thus, the "actual use" test applied in those cases was less demanding. *See Camp Foster,* 503 N.W.2d at 411; *St. Ambrose Univ.,* 503 N.W.2d at 407. It was not necessary for the YMCA or St. Ambrose University to establish that their child care facilities were charitable endeavors, so long as the facilities furthered the entities' charitable or educational missions. *See Camp Foster,* 503 N.W.2d at 411; *St. Ambrose Univ.,* 503 N.W.2d at 407. Accordingly, in the *Camp Foster* case, the child care center was held exempt because it "promote[d] the general mission of the YMCA through meeting a recognized need of the local community." 503 N.W.2d at 411. The child care facility in *St. Ambrose University* was granted exempt status because it facilitated the educational goals of the university's students and faculty. 503 N.W.2d at 408.

In contrast, here, the sole charitable activity of the Center is the operation of its child care facility. Therefore, this court must determine to what extent that activity is itself charitable. Although we have no cases considering the exempt status of child care operations in this context, we can look for guidance to the numerous cases involving the care of the elderly by entities whose sole charitable endeavor was the facility at issue. *See Friendship Haven, Inc. v. Webster County Bd. of Review,* 542 N.W.2d 837, 838 (Iowa 1996);

*Care Initiatives,* 500 N.W.2d at 15; *Atrium Village, Inc. v. Board of Review,* 417 N.W.2d 70, 71 (Iowa 1987); *Richards,* 414 N.W.2d at 346; *Dow City Senior Citizens Hous., Inc. v. Board of Review,* 230 N.W.2d 497, 498 (Iowa 1975); *Evangelical Lutheran Good Samaritan Soc'y v. Board of Review,* 200 N.W.2d 509, 510 (Iowa 1972); *South Iowa Methodist Homes,* 173 N.W.2d at 526–27; *Mayflower Homes,* 472 N.W.2d at 633; *Friendship Ctr. West, Inc. v. Harman,* 464 N.W.2d 455, 456 (Iowa App.1990); *Bethesda Found. v. Board of Review,* 453 N.W.2d 224, 225 (Iowa App. 1990); *Twilight Acres, Inc. v. Board of Review,* 346 N.W.2d 40, 41 (Iowa App. 1984); *Hilltop Manor v. County Bd. of Review,* 346 N.W.2d 37, 38 (Iowa App. 1984); *Evangelical Lutheran Good Samaritan Soc'y v. Board of Review,* 267 N.W.2d 413, 414 (Iowa App.1978). We now examine these cases for guidance in determining the extent to which providing care to persons is charitable.

In reviewing our cases considering facilities for the elderly, there appear to be two requirements for the facility to qualify as a charitable endeavor. First, the facility must provide some level of care, as opposed to mere housing. *Richards,* 414 N.W.2d at 351 ("For an institution to be charitable it should provide care in addition to housing."); *see also Dow City,* 230 N.W.2d at 499 (noting, in denying exempt status, that taxpayer provided housing, but no care). Second, the care must be made available on a gratuitous or partly gratuitous basis. *See Richards,* 414 N.W.2d at 353 (stating that "a truly charitable institution will make concessions on fees to residents unable to pay them" and that "the '*partly* gratuitous' care of certain persons is a charitable purpose"). Accordingly, we have denied an exemption where the facility charged its occupants the full cost of their care and did not provide concessions on fees for those unable to pay. *See, e.g., Friendship Haven,* 542 N.W.2d at 840–41 (denying exemption in part because occupants of facility paid for their housing and

care and so were not the recipients of charity); *Care Initiatives*, 500 N.W.2d at 18 (rejecting taxpayer's argument that it provided gratuitous care to Title XIX residents where evidence showed that Title XIX reimbursement rate exceeded the facility's average cost per patient day); *Atrium Village*, 417 N.W.2d at 71, 73 (denying exemption where monthly charges to residents were set at a level to recoup taxpayer's expenses and facility did not admit or retain those persons who were unable to pay); *Dow City*, 230 N.W.2d at 499 (refusing exemption where charges were set at a level to make facility self-sufficient and no rent concessions were made to residents based on need). On the other hand, where charitable contributions defray the residents' expenses, or fees are waived for needy residents, a charitable exemption has been granted. *See, e.g., Richards*, 414 N.W.2d at 353 (upholding exempt status where contributions of money, goods and services supported the establishment of the facility and helped to cover its ongoing operating expenses, and facility had admitted persons who could not pay in full); *South Iowa Methodist Homes*, 173 N.W.2d at 532–33 (granting exemption where room costs exceeded charges and some residents' fees were subsidized by the taxpayer); *Bethesda Found.*, 453 N.W.2d at 228 (holding the requirement that care be gratuitous or partly gratuitous was met where admission was nondiscriminatory and Title XIX payments did not cover the daily cost of covered residents); *Hilltop Manor*, 346 N.W.2d at 39 (holding that home for the elderly was exempt where fees covered only operating costs—facility had been built with donations—and recreational and religious activities were provided gratuitously by a volunteer auxiliary organization).

■ From these cases, we conclude that charity—gratuitous or partly gratuitous care—can be provided in two different ways. One manner of providing gratuitous or partly gratuitous care is to subsidize the care of those who are unable to pay. Another route of meeting the gratuitous-or-partly-gratuitous requirement is to use charitable contributions to cover the costs of establishing the facility and some portion of the ongoing operating expenses, thereby subsidizing the cost of the facility for all persons who use it, regardless of their ability to pay. We turn now to the facts of this case to determine whether the Center subsidized the costs of child care for those clients who could not otherwise afford to pay for the services, or whether charitable contributions helped to defray the costs of the building and the continuing operation of the day care, resulting in a below-expenses charge for those using the facility.

VI. *Application of Actual Use Test to Facts.*

■ The record shows that the Center is a state-licensed day care. It furnishes routine custodial care to children of parents who cannot personally supervise their children during the daytime. Unlike unlicensed, in-home day care providers, the Center is required to meet specific staff-to-child ratios designed to ensure the safety and health of the children, and its employees must have annual training in first aid and CPR. In addition to day care services, the Center has a pre-school program that is licensed by the Iowa Department of Human Services (DHS). Meals are served to all the children.

The Center is nondiscriminatory with respect to the families it serves. No evaluation of need or ability to pay is made and families that receive subsidies from the DHS are accepted. The director testified that forty to fifty per cent of the children who attend the Center qualify under the state's child and adult food care program for free or reduced-cost meals.

The Center sets its charges to clients below its actual cost of providing care for the children.[1] The director testified that if

1. It is difficult to accurately determine from the record the precise hourly cost of provid-

the Center charged what it actually cost to care for the children, many of its clients could not afford to bring their children to the Center's day care. (According to the director, most of the parents of the children the Center serves receive minimum wage.) To make up the difference, the Center receives cash and in-kind contributions from local businesses and individuals, the local United Way, and local governmental entities; it also conducts frequent fundraising events.[2]

All families are charged at the same rate, without regard to their financial resources, except those families who qualify for assistance from DHS. Because the Center accepts DHS clients, it must offer its services to such clients at the rate set by DHS. The DHS rates for child care services have ranged between thirteen and seventy cents per hour less than the rates charged other families using the Center's day care. Approximately, five per cent of the children at the day care participate in the DHS program.

It is not the policy of the Center to provide free day care services. If a family has difficulty in paying the charges, the Center will attempt to work out a payment plan. In one case, for example, it waived payment until the family's financial situation had improved. In other cases, the Center has allowed a parent to work at the day care to reduce the family's child care bill. Payment is, however, expected at some point. There were only four cases in 1996 and 1997 where the Center wrote off charges as uncollectable because it knew the families in question could not pay; these charges totaled $372.48. When the Center believes a family has the resources to pay charges that are due, it has sought to collect overdue amounts in court. On the other hand, the Center has never refused to provide care to a family having difficulty paying its bill so long as the parents are employed and attempt to make some payment on their account.

From these facts, we conclude, first of all, that the Center furnishes more than mere housing or a place where children can reside while their parents are at work. It provides care in the form of supervision, recreational activities, and meals. Second, we conclude that all clients of the Center are receiving subsidized child care and, accordingly, all clients are receiving partly gratuitous services. This conclusion is

---

ing care in order to be able to compare that cost to the Center's hourly charges. Nevertheless, we can determine from the record that contributions account for a significant portion of the Center's income, and yet, with the exception of one year, it has consistently operated at a loss. The Board has not disputed the validity of the Center's operating expenses, nor has it argued that its operating losses were due to inefficient management or some other factor within the control of the Center. It appears that the Center's income is simply insufficient to cover the legitimate costs of providing day care for the Center's clients. We readily conclude, therefore, that the Center's charges are less than its cost of furnishing services.

2. When the Center purchased and remodeled a new facility in 1996, it received almost $200,000 in in-kind and cash contributions and pledges towards the total cost of $771,-000. (The balance of the cost was financed primarily by a low-interest federal loan.) Ongoing expenses are defrayed in part by contributions from the City of Carroll, Carroll County, the Carroll Community Schools, the United Way, and local businesses and individuals.

The Board discounts these contributions as indicative of a charitable activity because many of those making donations did so with the view that a quality child care center would facilitate economic development in Carroll County. We have found nothing in our prior case law, however, that makes the motivation of those contributing to a facility determinative of whether the facility is a charitable endeavor. See Atrium Village, 417 N.W.2d at 73 ("[A] statutory exemption does not depend alone on lofty or generous motives on the part of the donor."). No doubt many private businesses and individuals are motivated to donate to worthy causes by the tax deduction given for such contributions. Their contributions are, nonetheless, considered charitable. Thus, it is the fact that voluntary contributions are made by the community that is important, not the personal motivations of the donors.

based on two facts: (1) the Center charges less than it costs to provide the care; and (2) it obtains contributions from the community to make up the difference. The charitable nature of the Center's activities is further established by the additional concessions it makes for low-income families who participate in the DHS program.

As we noted earlier, the Board argues that the Center's exemption should be limited to that percentage of its clients who qualify for DHS assistance. But as our review of this court's prior cases shows, charity is not limited to the needy. *See, e.g., South Iowa Methodist Homes*, 173 N.W.2d at 533 (holding that retirement home did not lose its tax exempt status because some of its residents were financially able to pay for their care); *accord Hilltop Manor*, 346 N.W.2d at 39 (noting the fact that residents could pay facility's charges was not a basis to deny a charitable exemption where evidence showed that some services to residents were provided gratuitously and residents made no payment to cover cost of building or equipment, as those had been totally paid by donations). The fact that care for all clients is subsidized by charitable donations from the community entitles the Center to a full exemption, as determined by the trial court. Accordingly, the judgment of the district court is affirmed.

**AFFIRMED.**

All justices concur except McGIVERIN, C.J., who dissents, and LAVORATO, J. who takes no part.